579 So.2d 931 (1991)
Franz SOCORRO
v.
The CITY OF NEW ORLEANS, The State of Louisiana, and The Board of Commissioners of the Orleans Levee District.
Nos. 90-C-1633, 90-C-1653.
Supreme Court of Louisiana.
May 6, 1991.
Rehearing Dismissed June 13, 1991.
*933 Vincent J. Glorioso, Jr., Ronald A. Welcker, Glorioso & Welcker, New Orleans, and Edward A. Kaufman, Jeffrey Dickstein, and David W. Robertson, Baton Rouge, for Franz Socorro, plaintiff-applicant.
Phillip A. Wittmann, Stephen H. Kupperman, Charles L. Stern, Jr., Alex J. Peragine, Stone, Pigman, Walther, Wittmann & Hutchinson, and Raymon G. Jones, and Jaime C. Waters, Deutsch, Kerrigan & Stiles, New Orleans, for Bd. of Com'rs of the Orleans Levee Dist.
Robert A. Redwine and Alan D. Ezkovich, Sessions & Fishman, New Orleans, for City of New Orleans, defendant-respondent.
CALOGERO, Chief Justice.
This is a personal injury lawsuit for damages sustained when the plaintiff, Franz Socorro, dove from the bulkhead at Breakwater Point on Lake Pontchartrain and struck a submerged object. The plaintiff suffered injuries to his spinal cord resulting in permanent quadriplegia.
Socorro filed a petition for damages in the Civil District Court for the Parish of Orleans, naming as defendants the City of New Orleans, the Board of Commissioners for the Orleans Levee District (the Levee Board), and the State of Louisiana. He *934 also named as defendants several liability insurance companies. One of them was named in the petition as "DEF Insurance Company" and identified as the City's principal liability insurer. During discovery, plaintiff's counsel learned "DEF's" identity  Angelina Casualty Company. Although the petition was not amended to substitute Angelina in place of "DEF," Angelina filed a motion for summary judgment (later denied) through the same attorney who represented the City.
The parties have conceded in briefs that pending trial, a partial settlement was reached between the plaintiff, the City and its excess liability carrier, whereby plaintiff released the City for all liability in excess of one million dollars ($1,000,000.00), and presumably fully released the excess insurance carrier as well.
After a bench trial, the judge apportioned 60% fault to the City, 30% fault to the Levee Board, 10% fault to the plaintiff, and no percentage of fault to the State. The district court awarded the following damages:

Future Medical Expenses $4,352,943.00
Loss of Future Earning
 Capacity 338,145.00
Past Medical Expenses 139,091.35
Pain and Suffering 3,500,000.00
 _____________
 Total Judgment $8,330,179.35

All parties but the State appealed. The Fourth Circuit Court of Appeal agreed with the judge's assessment of damages, but limited the pain and suffering award to $500,000.00 by applying retroactively the provisions of LSA-R.S. 13:5106(B)(1).[1] Finding clear error in the district court's apportionment of fault because "a swimmer or diver has a primary duty to determine the safety of such inherently dangerous activities," the court of appeal held plaintiff to be 75%, not 10%, at fault for his own injuries. The remaining 25% fault was assigned to the City under Civil Code articles 2316 (negligence) and 2317 (strict liability). The court of appeal exonerated the Levee Board, and in doing so reversed the district court in that respect. It affirmed the district court's finding no portion of fault attributable to the State. Socorro v. Orleans Levee Board, 561 So.2d 739 (La. App. 4th Cir.1990). While the lower courts cast the City in judgment, they refused to cast the City's principal liability insurer, Angelina Casualty Company.
We granted writs upon application of the plaintiff (No. 90-C-1633) and the City (No. 90-C-1653). The assignments of error which chiefly prompted our grant of the two applications were the plaintiff's complaint about the court of appeal's retroactive application of LSA-R.S. 13:5106(B)(1) ($500,000 cap on general damages), and the City's complaint that it was not liable for plaintiff's injuries at all because it had no duty to warn of the inherent dangers of diving into unknown waters. Nonetheless, the case is fully before us, and a proper resolution requires that we address and resolve a number of issues. For the forthcoming reasons, we resolve the main issues before us in the following manner:
With respect to the plaintiff's assignments of error, we conclude:
1. The court of appeal erred in retroactively applying LSA-R.S. 13:5106(B)(1) to limit Socorro's recoverable damages for pain and suffering to $500,000 (Section IV);
2. The court of appeal erred in approving the district court's refusal to enter judgment against Angelina Casualty Company, the City's liability insurer (Section VII).
3. The court of appeal was not incorrect in finding both Socorro and the City negligent, and in apportioning 75% fault to Socorro and 25% fault to the City (Sections II-III).
4. The court of appeal was not incorrect in exonerating the Levee Board and the State (Section I);
With respect to the City's assignments of error, we conclude:
*935 1. The court of appeal was not incorrect in determining that the City breached its duty to warn under these circumstances. (Section II).
2. The lower courts were not incorrect in determining that the City is not entitled to recreational immunity under LSA-R.S. 9:2791 and 9:2795, nor discretionary immunity under LSA-R.S. 9:2798.1 (Section V).
3. The lower courts were not incorrect in determining that evidence of Socorro's blood alcohol level was inadmissible (Section VI).
Although the City's 25% proportionate share of the awarded damages equates to $2,082,544.84, we take note of the partial settlement limiting the plaintiff's recovery from the City to one million dollars ($1,000,000.00).[2] For this reason and for reasons to follow, including the fact that Angelina Casualty made a general appearance in this litigation[3], we will cast in judgment solidarily both the City and Angelina for $1,000,000.00.

FACTS
On October 19, 1983, Franz Socorro, a 21 year old citizen of Venezuela, was a student at Delgado Community College in New Orleans. He had been in the United States for about five weeks and had never been to Lake Pontchartrain. After class that warm afternoon, Socorro and his friend Ronald Clarke (who was from Peru) bought a six pack of beer and decided to drive to Lake Pontchartrain for a swim. While driving on Lakeshore Drive looking for a place to swim, they observed many "no diving" and "no swimming" signs along the lakefront. These signs had been erected by the Orleans Levee Board.
Still searching for a place to swim, the young men eventually parked on the western end of Lakeshore Drive. They looked across the entrance to the Municipal Yacht Harbor and saw people windsurfing and swimming in the waters near Breakwater Point. The Point is a man-made peninsula which forms the tip of Breakwater Drive, and juts out into Lake Pontchartrain in an easterly direction. Breakwater Drive and the Point are controlled exclusively by the City under a grant from the State. See Acts 1906, No. 209. Breakwater Drive is a road which was constructed by the City atop a breakwater, a sloping structure made up in part of pieces of asphalt and concrete paving of varying sizes, called "rip rap", which protects the road by breaking the force of the waves in Lake Pontchartrain. The court of appeal found that the breakwater is approximately one hundred feet wide at its base, and narrows as it rises out of the water. The Point at the end of Breakwater Drive is a semicircular seawall, the interior of which is a parking area. Although concealed by the lake waters, rip rap also covers the sloping lake bottom which surrounds the Point. The rip rap is an integral structural component which prevents erosion. As plaintiff's safety expert, Dr. M. Alexander Gabrielsen said:
... the purpose for taking this [photograph] was merely to show the rock formation that constitutes the rip rap, so to speak, to prevent erosion of this point. If it didn't have this, one good storm would wipe out the whole point. They have to have that rip rap in there on both sides.
Tr. at 134.
Hoping that they had found a place to swim, Socorro and Clarke drove onto Breakwater Drive toward the Point, and noticed the rip rap protruding from the waters on both sides of the road. They entered the "Breakwater Recreation *936 Area,"[4] which includes the Point, and noticed no signs in that area prohibiting swimming or diving. The lower courts found that the plaintiff assumed it was appropriate to swim and dive there because of the lack of any warning signs on the Point (under the City's jurisdiction), coupled with the large number of prohibitory signs along the lakefront (under the Levee Board's jurisdiction) leading to Breakwater Drive and the Point.
Surrounding three sides of the Point is a one foot high vertical concrete bulkhead; the bulkhead is flat on top and approximately fifteen inches in width. The lower courts found that there was no visible rip rap in the waters surrounding the bulkhead at the Point, and that the surface of the water was four to five feet below the top of the bulkhead. The two friends stood on the bulkhead and observed the water. They testified that it appeared to be dark and deep. Without either of the two ascertaining the depth of the water, Ronald Clarke jumped in feet first from the bulkhead. He testified that he never touched the bottom of the lake or any other objects. Socorro testified that he then successfully executed two "flat" racing dives in a southerly direction from the bulkhead. Although Socorro had been a competitive swimmer and diver in Venezuela, he too did not attempt to touch bottom to determine the depth of the water.
Socorro's third and final dive from the bulkhead was a false start to a race that he and his friend Clarke were about to stage. As Clarke remained on the bulkhead, Socorro dove into the water and struck his head on a submerged object which was apparently a piece of rip rap lying on the lake bottom about ten feet from the southern side of the Point. Socorro described the object as a "rock," and Clarke described it as a "big stone." Because Socorro became motionless in the water, Clarke waded in to help him, touching the lake bottom for the first time. Clarke testified that the water was chest high and that the lake bottom was covered with "a lot of stones." Socorro told Clarke that he could not feel anything. The impact had broken his neck. Socorro is now a quadriplegic living in Venezuela with his family.

I. THE STATE AND THE LEVEE BOARD ARE NOT STRICTLY LIABLE
Socorro's primary contention in brief is that in addition to the City being liable (as found by the lower courts), the Levee Board, the State, or both, are also liable, the contention being that either or both of those defendants had the requisite garde of the lake bottom and/or a small part of the Point.[5] Indeed, La.Civ.Code article 2317 does impose strict liability upon one who has custody or control (garde) over the thing which causes harm, if that thing has a vice or defect which poses an unreasonable risk of harm. Loescher v. Parr, 324 So.2d 441 (La.1975); see also Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990), and cases cited therein.
After a comprehensive review of various legislative provisions[6] to ascertain which *937 defendant had custody and control of the relevant portion of the lake, the Point, and Breakwater Drive, the court of appeal found that (1) Breakwater Drive and the Point were under the custody and control of the City pursuant to Acts 1906, No. 209; and (2) the lake bottom in the area into which Socorro dove remained in the custody and control of the State, not the Levee Board as the district court had found. 561 So.2d at 746-49. The court of appeal then concluded that although the lake bottom was in the State's garde, the State was not liable because the injury causing object was a submerged piece of rip rap which was part of the breakwater, and that was the City's responsibility. Id. at 752.
Plaintiff's primary argument is that the Levee Board should be held strictly liable because it had garde of the area of the Point from which Socorro dove, as well as the relevant portion of the lake bottom. Plaintiff bases his argument on two statutory provisions: 1) LSA-R.S. 38:307 (originating in our Constitution of 1913), the provision by which the State conferred upon the Levee Board the power and authority within an area not to exceed three miles from the then existing shoreline to carry out its flood control plans; and 2) Acts 1906, No. 209, the provision whereby the State granted to the City the exclusive jurisdiction, administration and control over a defined area of Lake Pontchartrain, where the City built the breakwater, Breakwater Drive and the Point. Regarding this latter Act, the district court found that the eastern boundary of the defined area intersects the Point near its easternmost extension. Thus, the argument is that the part of the Point from which Socorro dove and the waters of Lake Pontchartrain into which he dove were outside of the area of the City's jurisdiction.
Although the court of appeal did not take issue with the district court's finding relative to the eastern boundary of the ceded property, it concluded that the relevant portions of the Point and the surrounding lake bottom were nonetheless not in the garde of the Levee Board. In this respect, the court of appeal relied upon our decision in State ex rel Guste v. Board of Commissioners of the Orleans Levee District, 456 So.2d 605 (La.1984) for its conclusion that the State's grant of authority to the Levee Board in LSA-R.S. 38:307 is not "equivalent to garde over the entire area within the Board's jurisdiction." 561 So.2d at 749. The court of appeal's reference here was specifically to the lake area within the three mile band that has not been reclaimed by the Levee Board. We agree with the conclusion of the court of appeal. The Levee Board has no custody and control over any part of the Point or surrounding lake area. The district court's contrary conclusion was incorrect as a matter of law. The court of appeal was correct in exonerating the Levee Board.
We turn now to the exoneration of the State by both the district court and the court of appeal. The court of appeal held that the lake bottom remained in the garde of the State, yet the State was not liable under Article 2317. To find a defendant strictly liable, the plaintiff must prove that 1) the thing which caused damage was in the defendant's custody and control (garde); 2) the thing had a vice or defect which created an unreasonable risk of harm; and 3) the injuries were caused by a defect. Sistler, 558 So.2d at 1112. The record supports the court of appeal's determination that the injury-causing object was not the lake bottom, but rather the dive site and rip rap forming part of the breakwater in the custody and control of the City.[7] Accordingly, there is no basis upon *938 which the State could be subjected to Article 2317 liability. The district court's exoneration of the State and the court of appeal's affirmance in that respect were correct.

II. BOTH THE CITY AND SOCORRO WERE NEGLIGENT
For the reasons which follow, we agree with the court of appeal's determination that the negligence of both the City of New Orleans and the plaintiff himself contributed to plaintiff's resulting injury.[8] The court of appeal found the City responsible under a negligence theory because the City took no measures to either remedy or warn of an unreasonably dangerous risk which the City knew or should have known of. The court of appeal found that the unreasonably dangerous risk was created by the following facts and circumstances:
the shallow murky waters off the Point, the presence of large chunks of rip rap lying on the lake bottom, the inviting and alluring nature of the bulkhead which created an "illusion of safety", the regular use of the water off the Point (a dedicated recreation area) by the public for swimming and other water sports, and the clear absence of any warning or prohibitory signs or barriers as were present along other areas of the lakefront....
Socorro, 561 So.2d at 753.
The City argues that it is free from fault under the authority of a line of Louisiana appellate court cases which have held that a landowner has no duty to warn of the obvious danger of diving into unknown waters. The City cites Stuart v. City of Morgan City, 504 So.2d 934 (1st Cir.1987); Van Pelt v. Morgan City Power Boat Assoc., Inc., 489 So.2d 1346 (La.App. 1st Cir.), writ granted, 493 So.2d 627 (La.1986) (dismissed because of compromise); Sonnier v. Dupin, 416 So.2d 1371 (La.App. 3rd Cir. 1982); Caillouette v. Cherokee Beach & Campgrounds, Inc., 386 So.2d 666 (La. App. 1st Cir.), writ denied, 387 So.2d 597 (La.1980); Hall v. Lemieux, 378 So.2d 130 (La.App. 4th Cir.1979). The City contends that the court of appeal's decision in this case creates a conflict among the circuits which we must resolve by addressing the issue of whether a landowner has a duty to warn of the obvious danger of diving into unknown waters.
In addressing this issue, we first note that under traditional duty/risk analysis, we are to view the defendant and the accident victim as individual and unique social actors, rather than representatives of groups of social actors. See H. Steiner, Moral Argument and Social Vision in the Courts: A Study of Tort Accident Law 115 (1987). The issue as put to us by the City is stated in such broad terms that our considering either a yes or no answer would shift the focus of this case from the proper inquiry of whether the City is responsible to Franz Socorro under the facts of this case, to the improper question of whether all riparian landowners are responsible to all plaintiffs injured in diving accidents under all circumstances. Rather, the particular facts and circumstances of each individual case determines the extent of the duty and the resulting degree of care necessary to fulfill the duty. Kent v. Gulf States Utilities, 418 So.2d 493, 497 (La. 1982).
Duty-risk analysis guides our efforts in making this determination. Such analysis requires the court to take into account the conduct of each individual party and the peculiar circumstances of the case. In Mart v. Hill, 505 So.2d 1120, 1122 (La. 1987), we set forth the following questions to aid us in determining the responsibilities of the parties:
(1) Was the conduct in question a cause-in-fact of the resulting harm?

*939 (2) What, if any, duties were owed by the respective parties?
(3) Were the requisite duties breached?
(4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
See also Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990); Molbert v. Toepfer, 550 So.2d 183 (La.1989); Shelton v. Aetna Casualty & Sur. Co., 334 So.2d 406 (La.1976); Hill v. Lundin and Assoc., Inc., 260 La. 542, 256 So.2d 620 (1972); Pierre v. Allstate Insurance Company, 257 La. 471, 242 So.2d 821 (1970); W. Crowe, The Anatomy of a Tort, 22 Loy.L. Rev. 903 (1976).
Under the first inquiry, we have stated that "[n]egligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm." Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 482, 137 So.2d 298, 302 (1962). Under the facts and circumstances of this case, the conduct of both the City and the plaintiff were substantial factors in bringing about plaintiff's injury. The City's conduct was a substantial factor because it created an unreasonable risk of harm. The plaintiff's conduct of failing to ascertain the safety of his dive by checking the depth and underwater conditions was also a substantial factor in bringing about his own injuries.
Under the second inquiry, we must assess the duties owed by both the City and the plaintiff. Turning first to the plaintiff's conduct, we recognize that our courts have uniformly held that it is the primary duty of the swimmer or diver to ascertain the safety of such inherently dangerous activities. See, e.g., Socorro, 561 So.2d at 760; Stuart v. Morgan City, 504 So.2d at 938; Jolivette v. City of Lafayette, 408 So.2d 309 (La.App. 3d Cir.1981), writ denied, 413 So.2d 495 (La.1982). We have explained that the ease of association between the duty owed and the risk encountered is a proper focus of inquiry in finding the existence of a duty. Lejeune, 556 So.2d at 568-69; Dunne v. Orleans Parish School Bd., 463 So.2d 1267 (La.1985); Hill v. Lundin and Assoc., Inc., supra. The risk of sustaining a neck injury while diving head first into untested waters is easily associated with Socorro's duty to ascertain the safety of his dive. Socorro was in a better position than anyone to determine the safety of his activities, thus justifying the primary duty placed upon him. By failing to determine the depth of the water (which the record showed to be approximately 4 feet) and failing to investigate the bottom conditions which would have revealed the presence of rip rap, Socorro breached his duty to assure the safety of the waters into which he dove. We conclude that Socorro was negligent because he knew or should have known of the risks he encountered and failed to take reasonable steps to prevent his injury.
Turning to the City's duty, we have consistently held that a landowner owes a plaintiff a duty to discover any unreasonably dangerous conditions and to either correct the condition or warn of its existence. See, e.g., Shelton v. Aetna Casualty & Surety Co., 334 So.2d 406, 410 (La.1976) (citations omitted). The record supports the lower courts' findings that the sudden absence of warning signs at the Point combined with the alluring bulkhead and the submerged rip rap, created an unreasonably dangerous condition. The City was thus under a duty to warn of its existence, and the district court and court of appeal were not clearly wrong in so holding.
Whether a particular risk is unreasonable is a difficult question which requires a balance of the intended benefit of the thing with its potential for harm and the cost of prevention. Landry v. State, 495 So.2d 1284, 1288 (La.1986); Entrevia v. Hood, 427 So.2d 1146 (La.1983). The court of appeal properly found social utility in the frequent recreational use of the breakwater, the Point and its surrounding waters. 561 So.2d at 752. The rip rap covering the lake bottom surrounding the Point is also beneficial in that it serves the necessary function of preventing erosion caused by the wave action of Lake Pontchartrain.
The court of appeal properly concluded that the breakwater and the Point in the City's custody posed an unreasonable risk *940 of harm because the minimal cost of preventing the possibility of harm outweighed its intended benefits:
Gabrielsen [plaintiff's expert in aquatic recreational areas] stated that the height and configuration of the bulkhead served as an invitation to use it for a platform and dive off. Because there were no rails, barriers or prohibitory signs to deter such activity, he opined that the bulkhead created an "illusion of safety".... This "illusion of safety" was further emphasized by the fact that there were numerous signs posted along other sections of the lakefront prohibiting swimming and diving with a complete absence of such signs at the Point. Under the circumstances, one could reasonably conclude that these activities were not only permitted at the Point, but were safe. Gabrielson concluded that under these facts, this type of accident could have been prevented through the use of very simple and inexpensive measures such as warning or prohibitory signs on the bulkhead or in the water close to the bulkhead or a rope railing or other type barrier to prevent diving from atop the bulkhead. He estimated the expense for minimal prevention (signs or a rope railing) to be approximately ten dollars.
561 So.2d at 751-52 (emphasis added) (footnotes omitted).
The City was therefore under a duty to warn this plaintiff of the unreasonable risk of harm created by the circumstances of this case (the sudden absence of warning signs, the inviting nature of the bulkhead as a diving platform, the deep appearance of the water concealing the rip rap). Furthermore, the risk of a diving injury under these conditions is well within the scope of the City's duty because the evidence establishes that the City could have reasonably anticipated that one of the many people who use its recreational facility could perceive the bulkhead as an attractive diving platform, and that this type of harm could arise in this manner. See Hill v. Lundin, 256 So.2d 620, 623 (La.1972) (a risk is within the scope of a defendant's duty if the defendant could have "reasonably anticipated" harm arising in a particular manner).
We conclude that this duty was breached based on the City's failure to take the minimal and inexpensive preventive measure of posting a warning or prohibitory sign. This neglect was unreasonable considering the probability and magnitude of the potential harm.[9]Levi v. S.W. La. Elec. Membership Co-op, 542 So.2d 1081 (La.1989). We note that the lack of warning signs alone in an area adjacent to natural waters does not in and of itself create an unreasonably dangerous condition. Because the owner cannot be held responsible for all injuries resulting from any risk, the court's duty is to decide which risks are unreasonable. This inquiry requires a weighing of the moral, social, and economic values and the ideal of justice within the framework of the facts and circumstances of each individual case. Landry, 495 So.2d at 1287; Entrevia, 427 So.2d at 1149.
The lower courts were correct in finding that the lack of warning signs at the Point created an unreasonably dangerous condition based on a particular distinguishing factor from most areas adjacent to natural bodies of water; the lack of warning signs at the Point was in sharp contrast to the many "no swimming," "no diving" signs found elsewhere along the nearby lakefront area. Although the Levee Board posted these signs, the court of appeal was not incorrect in rejecting plaintiff's argument that the Levee Board had a duty to place warning signs in an area where it had no jurisdiction. Rather, the City, the governmental entity with exclusive jurisdiction, administration and control over Breakwater Drive and the Point, created the unreasonably hazardous illusion that swimming and diving were permitted because of *941 the sudden absence of prohibitory signs combined with the character of the Point and its bulkhead. The record supports the determination that the City was negligent because it knew or should have known of this unreasonable risk of harm, and took no measures to warn persons like the plaintiff.
The City argues that the Fourth Circuit's decision in this case conflicts with its prior decision which held that there is no duty to warn persons of the full age of majority of the obvious dangers inherent in natural bodies of water. Hall v. Lemieux, 378 So.2d 130 (La.App. 4th Cir.1979), writ denied, 381 So.2d 1220 (La.1980). Reasoning that the danger was not obvious because the rip rap under the murky waters of Lake Pontchartrain presented a "concealed or hidden danger" in the area where plaintiff dove, the court of appeal properly rejected the City's "no duty" argument. Socorro, 561 So.2d at 759-60.
In Murray v. Ramada Inns, Inc. 521 So.2d 1123 (La.1988), under similar facts, we expressly disapproved the same "no duty" argument that the City is making in the present case. In Murray, plaintiff was injured by diving into a motel swimming pool. We held that the old doctrine of assumption of risk, formerly a bar to recovery in such cases, has been subsumed into the comparative fault system such that Murray's taking the risk of diving into the shallow pool could no longer bar his recovery but should rather reduce it on a percentage-fault basis. Having failed to prevail on its assumed risk argument, the Murray defendant then fell back upon exactly the same "no-duty" argument that the City now asserts. We explained that a defendant's duty is not to be defined in terms of the plaintiff's actual knowledge or conduct. We stated:
... Defendants suggest that, leaving aside the doctrine of assumption of risk, they should not be liable because they had no duty to protect the decedent from a danger of which he had knowledge. In essence, defendants contend here that they were not negligent because the plaintiff voluntarily encountered the risk.
The Fifth Circuit wisely rejected this contention. 821 F.2d at 276. If accepted, defendants' argument would inject the assumption of risk doctrine into duty/risk analysis `through the back door.' By that, we mean that the argument attempts to define the defendant's initial duty in terms of the plaintiff's actual knowledge, and thereby seeks to achieve the same result which would be reached if assumption of risk were retained as a defense, i.e., a total bar to the plaintiff's recovery.
Murray, 521 So.2d at 1135-36 (emphasis in original).
Therefore, Murray requires a review of the City's duty separate and apart from any knowledge the plaintiff had or should have had of the danger he was encountering. The group of appellate court cases cited by the City for the proposition that it had no duty to warn of the obvious danger of diving into unknown waters, all barred recovery by a partially negligent plaintiff under the label "contributory negligence," "assumption of risk," or "no duty owed by defendant." These opinions focused on the knowledge and conduct of the plaintiff in concluding that no duty was owed by the defendant. This method of analysis has now been rejected by Murray, which explains that the plaintiff's knowledge and conduct is considered only to determine the extent of his comparative negligence. Murray, 521 So.2d at 1133.
The City argues that Murray recognized the continued validity of their "no duty" argument by upholding Shelton v. Aetna Casualty & Surety Co., supra, a case which explained that a "landowner is not liable for an injury resulting from a condition which should have been observed by an individual in the exercise of reasonable care or which was as obvious to a visitor as to the landowner." Shelton, 334 So.2d at 410. Although we reject the City's "no duty" argument under these facts, care should be taken to note that we maintain our policy that "the duty which a landowner owes to persons entering his property is governed by a standard of reasonableness, and that a potentially dangerous *942 condition that should be obvious to all comers is not, in all instances, unreasonably dangerous." Murray, 521 So.2d at 1136 (citing Shelton, 334 So.2d at 410). Therefore, under duty/risk analysis, if the facts of a particular case warrant, there could be a finding that a defendant owed no duty under the circumstances, or on the other hand, that a plaintiff was 100% at fault. Murray, 521 So.2d at 1137 (Cole, J., concurring). Having found, however, that under the facts of this case both parties were negligent, we turn to the issue of apportionment of fault.

III. APPORTIONMENT OF FAULT
Because Socorro was partially at fault for his injuries, he is entitled to recover his damages, minus a percentage thereof corresponding to his portion of comparative fault. Murray, 521 So.2d at 1123. Since the Louisiana legislature's adoption of a pure comparative fault system by Acts 1979, No. 431 (effective August 1, 1980), it has been the task of the factfinder to allocate shares of negligence. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 973 (La.1985); La.Civ.Code art. 2323. In Watson, this court adopted section 2(b) of the Uniform Comparative Fault Act which states that
[i]n determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed.
We then set forth several factors which may influence the respective degrees of fault:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Watson, 469 So.2d at 974; see also Dobson v. L.P. & L., 567 So.2d 569, 575 (La.1990); Mart v. Hill, 505 So.2d 1120, 1123 (La. 1987).
Because each of these factors which may influence the respective degrees of fault are factual considerations, the manifest error/clearly wrong standard applies. Watson, 469 So.2d at 972. Socorro argues that the court of appeal ignored the manifest error rule and improperly engaged in a de novo fact review when it increased the allocation of plaintiff's fault from 10%, as found by the trial court, to 75%. For the following reasons, we affirm the court of appeal's apportionment of fault.
In reviewing determinations of proportionate fault, we have previously compared the respective degrees of duty of the various parties and the degree of causation in the parties' breach of their respective duties. Mart v. Hill, 505 So.2d at 1123-24 (citing Turner v. NOPSI, 476 So.2d 800, 805 (La.1985) (Lemmon, J., concurring)). As discussed in the foregoing section, the City breached its duty to warn under the facts and circumstances of this case, and the plaintiff breached his duty to ascertain the safety of his dive. A comparison of these duties dictates that Socorro should be assigned a significantly higher degree of fault than the 10% assigned by the trial judge.
We have stated that "[a]ny person is required by law to recognize that his conduct involves a risk of causing harm to himself if a reasonable person would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence and judgment as a reasonable person would have." Dobson, 567 So.2d at 573 (citations omitted). The duty to recognize and take reasonable precautions to prevent harm to *943 oneself is especially applicable to the inherently dangerous activity of diving into natural bodies of water. Although the City was negligent in not warning of the submerged rip rap under the shallow waters off the Point, most conceivable instances of actual harm that could result from the City's negligent omission would require a diver acting in an even more negligent manner than the City. In other words, the unreasonably dangerous conditions at the Point due in part to the sudden absence of warning or prohibitory signs did not in and of itself cause harm; while the City's failure to warn was a partial cause, the injury suffered by Socorro was in most part caused by his own negligent conduct. Thus, a comparison of the respective degrees of duty and the respective degrees of causation regarding each party's breach of that duty, supports the court of appeal's conclusion that the district court was clearly wrong in assigning such a small percentage of fault to the plaintiff under these facts. Once the court of appeal found the district court clearly wrong, its independent weighing of the Watson factors led to a proper determination of 75% apportionment of fault to Socorro, and 25% apportionment of fault to the City.

IV. RETROACTIVITY OF $500,000 LIMIT ON GENERAL DAMAGES
We find it unnecessary to consider at length the City's contention that the plaintiff's award for damages of over eight million dollars was excessive, for this reason: only the City and its primary liability insurer are being cast in judgment. The City has been released by the plaintiff for all damages in excess of one million dollars as discussed at the beginning of this opinion, and their primary liability carrier, Angelina Casualty Company, has no exposure over one million dollars. The appropriate quantum award is surely substantially in excess of one million dollars. Indeed, it is not inconceivable that a scrutinizing assessment of plaintiff's damages may well reveal that the district judge's award was within the mid rather than upper range of a legally permissible assessment.[10]See Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976).
Although the court of appeal did not disturb the quantum awarded by the trial court, it did impose a $500,000 limit on the award for pain, suffering, and mental anguish by retroactively applying LSA-R.S. 13:5106(B)(1). Socorro, 561 So.2d at 761-62 (citing Mullet v. DOTD, 539 So.2d 897 (La.App. 4th Cir.), writ denied, 541 So.2d 1390 (La.1989)). Socorro asserts that the court of appeal erred in applying the statute retroactively. He is correct.
LSA-R.S. 13:5106(B)(1) limits the recovery of general damage in personal injury awards against the state, or any of its agencies or political subdivisions, to $500,000.00. See footnote 1, supra. LSA-R.S. 13:5102(B) includes municipalities within its definition of "political subdivision," thus placing the City within the purview of the statute at issue.[11] Enacted by Acts 1985, No. 452, § 1, the statute did not become effective until September 6, 1985. Plaintiff was injured on October 19, 1983. Therefore, his cause of action for injuries arose before the act became effective.
La.Civ.Code art. 6 provides that "[i]n the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretive laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary." Likewise, LSA-R.S. 1:2 provides that "no section of the Revised Statutes is retroactive unless it is expressly so stated." We have explained that this general rule applies only to substantive laws. Lott v. Haley, 370 So.2d 521, 523 (La.1979). Thus, *944 the question of whether LSA-R.S. 13:5106(B)(1) should be applied retroactively depends on whether the statute is properly deemed substantive or procedural.[12]
LSA-R.S. 13:5106(B)(1) is clearly substantive as opposed to merely procedural because it has the effect of changing the law regarding the amount of damages recoverable in personal injury lawsuits. The very substance of the claim for damages, the amount thereof, is affected by the legislation. The statute here is just as clearly substantive as the one which was held so in Landry v. State, 495 So.2d 1284, 1290 (La. 1986) (LSA-R.S. 9:2800, a statute removing governmental units from the reach of strict liability under Article 2317). And it is even more certainly substantive than the statute held to be so in Graham v. Sequoya Corp., 478 So.2d 1223, 1225-26 (La.1985) (LSA-C.C. art. 1935 (repealed), a statute providing for attorney fees in the collection of promissory notes) and Cambridge Corner Corp. v. Menard, 525 So.2d 527, 530 (La. 1988) (LSA-C.C.P. art. 1732 (amended), a statute revoking the right to jury trial in cases under $10,000).
We approve of Dubois v. State Farm Ins. Co., 571 So.2d 201 (La.App. 3d Cir. 1990), writ denied, 575 So.2d 367 (La.1991) and Hellmers v. Dept. of Transp. & Development, 503 So.2d 174 (La.App. 4th Cir.), writ denied, 505 So.2d 1141 (La.1987), each of which held that the statute under review here (LSA-R.S. 13:5106(B)(1)) is a substantive law entitled to only prospective application. To the extent that the following Fourth Circuit Court of Appeal cases applied LSA-R.S. 13:5106(B)(1) retroactively, they are expressly overruled: Bernard v. State, through DOTD, 563 So.2d 282 (La. App. 4th Cir.1990); Mullet v. State, through DOTD, 539 So.2d 897 (La.App. 4th Cir.), writ denied, 541 So.2d 1390 (La.1989). Likewise, we reverse the court of appeal in this case insofar as it retroactively applied the liability limiting statute. Socorro, 561 So.2d at 761-62.

V. IMMUNITY
The City asserts that even if it is otherwise subject to being held liable in this case, it is immune under: 1) LSA-R.S. 9:2791 and 9:2795, recreational immunity, and/or 2) LSA-R.S. 9:2798, discretionary immunity.

1. Recreational Immunity, LSA-R.S. 9:2791, 2795

These statutes provide that owners of premises used for non-commercial recreational activities are immune from any liability resulting from the condition of the premises. This immunity does not extend to liability arising from deliberate or malicious injury. LSA-R.S. 9:2791, 9:2795.
Whatever the possibility of the statutes' application to the activities involved in this case, their grant of immunity is not applicable to public lands, or to the state, its agencies or subdivisions. We so held in Monteville v. Terrebonne Parish Consol. Gov't, 567 So.2d 1097 (La.1990), an opinion rendered some five months after the court of appeal rendered its opinion in this case. The recreational immunity statutes therefore do not afford immunity to the City.

2. Discretionary Immunity, LSA-R.S. 9:2798.1

The City also contends that it is entitled to the statutory immunity granted by LSA-R.S. 9:2798.1. That statute grants governmental units qualified immunity from liability "based upon the exercise or performance or the failure to exercise or perform their policy-making or discretionary acts." LSA-R.S. 9:2798.1(B). We do not address the issue of whether the City's failure to warn under these circumstances was a "discretionary act" for the reason that the discretionary immunity statute is not to be given retroactive application to this 1983 accident. That statute was enacted in 1985 by Act No. 453 of the Legislature. The Act does not clarify procedure or provide a new remedy for enforcement of an obligation. Graham v. Sequoya Corp., 478 So.2d at 1226. For the reasons *945 set forth in the section of this opinion addressing the retroactivity of the $500,000 limit on general damages, we hold that LSA-R.S. 9:2798.1 is a substantive law to be given prospective application only. LSA-R.S. 9:2798.1 likewise affords no immunity to the City in this case.

VI. ADMISSIBILITY OF BLOOD ALCOHOL LEVEL
The City also contends that the district court erred in refusing to consider evidence of Socorro's blood alcohol level. The lower courts gave no weight to that evidence based on State v. Rowell, 517 So.2d 799 (La.1988), in which we gave directives for the proper foundation and predicate that must be established to ensure the integrity and reliability of blood alcohol tests. After a review of the record, we agree that the defendants failed to lay a proper foundation. We affirm the court of appeal's finding on this issue for the reasons more fully stated in their opinion. See Socorro, 561 So.2d at 757-58.

VII. LIABILITY OF ANGELINA CASUALTY CO.
The final assignment of error is Socorro's contention that the lower courts erred in failing to enter judgment against the City's primary liability insurer, Angelina Casualty Company (Angelina). In this respect, plaintiff is correct.
In his original petition, Socorro named several defendants, one of which was the City of New Orleans. At the time of filing the petition, Socorro was not aware of the identity of the City's primary liability insurance carrier; accordingly the petition included an allegation against "DEF Insurance Company," which was identified as the City's principal liability insurer. Through discovery, Socorro eventually learned that the City's insurer, "DEF," was Angelina Casualty Company. Although the petition was not thereafter amended to name Angelina as a defendant, that company filed a motion for summary judgment through the same attorney who served as counsel for the City. Angelina specifically came into court and moved for entry of summary judgment in their favor and against the plaintiff.
The pleading was signed by the attorney, with the designation of his law firm as "Attorneys for the City of New Orleans and Angelina Casualty Company." That motion for summary judgment on behalf of the City and Angelina was denied. The court of appeal concluded that because Angelina was not properly named and served, it could not be considered a "party" capable of making a general appearance as contemplated by Article 7 of the Code of Civil Procedure:
A. Except as otherwise provided in this Article, a party makes a general appearance which subjects him to the jurisdiction of the court and impliedly waives all objections thereto when, either personally or through counsel, he seeks therein any relief other than:
(1) Entry or removal of the name of an attorney as counsel of record;
(2) Extension of time within which to plead;
(3) Security for costs;
(4) Dissolution of an attachment issued on the ground of the nonresidence of the defendant; or
(5) Dismissal of the action on the ground that the court has no jurisdiction over the defendant.
La.Code Civ.Proc. art. 7 (West Supp.1991).
Because the filing of a motion for summary judgment is not included in this list, Angelina made a general appearance which subjected it to the jurisdiction of the court and impliedly waived all objections to the exercise of the court's jurisdiction.[13] The court of appeal's contrary determination *946 rests entirely on its rather strict reading of Article 7, which refers at the outset to a "party" (making a general appearance and subjecting himself to the jurisdiction of the court if he seeks any non-excepted form of relief). The court of appeal determined that to be covered by Article 7, one must first be a "party," a term which it chose to narrowly define as only those who are named in the petition and served with legal process.
It could not have been intended that the article should be read so strictly. See La. Code Civ.Proc. art. 5051. It is true that there are named parties not yet served who are meant to be made subject to the jurisdiction of the court by appearing and pleading for any non-excepted relief. See, e.g., Payne v. Old Hickory Ins. Co., 532 So.2d 956 (La.App. 4th Cir.1988), writ denied, 536 So.2d 1241 (La.1989); Dupont v. Poole, 335 So.2d 764 (La.App. 3d Cir), writ denied, 339 So.2d 19 (La.1976). But so are there unnamed parties, such as intervenors, who are allowed to come into the case by entering a general appearance, although not cited or served. La.Code Civ. Proc. arts. 1091-1094. Once Angelina appeared in court as the City's insurer and entered a general appearance by filing a motion for summary judgment, it became evident that Angelina was indeed the same defendant identified in plaintiff's pleadings as "DEF Insurance Company." Angelina has offered no argument that it has been in any way prejudiced or adversely affected by not having been served apart from service on the City. It has been represented all along by the same attorneys who represent the City, and has never taken any position contrary to the fact that it owes the identical obligation which the City would ultimately be bound for if and when cast in judgment.[14]
Plaintiff's neglect to amend the petition to substitute Angelina for "DEF" is of no moment under these circumstances. The answer filed on behalf of the City by the attorney also representing its insurer, protesting no fault on the part of the City, sufficiently joined issue such that it is proper that we enter judgment against both the City and Angelina.
Furthermore, if we were to conclude that Angelina has submitted to the jurisdiction of the court but cannot be cast in judgment until such time as plaintiff amends his petition and Angelina joins issue by answering, then the lawsuit, still pending below as regards Angelina, would require disposition after remand and supplemental pleadings and proceedings, an obviously time consuming and unnecessary extension of this litigation. In the courts below, plaintiff's judgment should have been against both the City and its liability insurer, Angelina Casualty Company, in solido. Accordingly, we will reverse the court of appeal on this issue and order that Angelina Casualty Company be cast in judgment in its capacity as the City's principal liability insurer.

DECREE
For the reasons above set forth, the judgment of the court of appeal is affirmed except insofar as it is inconsistent with this opinion and this decree, and it is ORDERED, ADJUDGED AND DECREED that there be judgment in favor of Franz Socorro and against the City of New Orleans and Angelina Casualty Company, jointly, severally and solidarily in the full and true sum of one million dollars ($1,000,000.00), together with legal interest from the date of judicial demand, and all costs.
COURT OF APPEAL JUDGMENT AFFIRMED IN PART, REVERSED IN PART; JUDGMENT RENDERED.
DENNIS, J., concurs with reasons.
WATSON, J., joins the opinion but assigns additional reasons.
*947 WATSON, Justice, assigning additional reasons.
While I agree with the analysis of liability by the majority and, therefore, concur with the opinion, I note that I do not agree entirely with the court of appeal's allocation of fault. The court of appeal increased plaintiff's allocation of fault from 10 percent to 75 percent. This enormous increase in the percentage of fault assigned to plaintiff is not justified by the record. The fault should be divided equally between plaintiff and the city, the result reached in Murray v. Ramada Inn, Inc., 821 F.2d 272 (5th Cir.1987), but under the circumstances, the division is of no importance.
I join the opinion with these explanatory reasons.
NOTES
[1] LSA-R.S. 13:5106(B)(1), effective September 6, 1985, provides, "In any suit (against a public entity) for personal injury, the total amount recoverable, exclusive of medical care and related benefits and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars."
[2] One million dollars is the limit of the City's principal liability coverage afforded by Angelina Casualty Co. There is no question but that Socorro released the City from any exposure above $1,000,000 because the parties have conceded as much in their briefs. Furthermore, we construe the specific concession made by the City's attorney in oral argument that the City has no exposure past $1 million to have been made in that attorney's dual capacity as counsel for both the City and its primary liability insurer, Angelina Casulty Co. See Section VII, infra.
[3] See Section VII regarding Angelina's liability.
[4] The City formally dedicated Breakwater Drive and the Point solely for public use and recreational purposes by Act of Dedication on November 26, 1968.
[5] Effective July 12, 1985, LSA-R.S. 9:2800 proscribes strict liability actions against public bodies, except for damages caused by the condition of buildings in the care and custody of the public entity. Although the State and Levee Board are public entities, we must consider the plaintiff's strict liability claim because R.S. 9:2800 does not apply retroactively to the October 19, 1983 incident in this case. Landry v. State, 495 So.2d 1284, 1290 (La.1986) ("Since the statute changes the substantive law of Louisiana it applies prospectively.")
[6] The court of appeal, at pages 746-49 of its opinion, reviewed the following legislative provisions: (1) La.Civ.Code art. 450 (ownership of navigable lake bottom remains with the State); (2) Acts 1906, No. 209 (State grant to the City of the exclusive jurisdiction, administration and control of Breakwater Drive and the Point); (3) LSA-R.S. 41:1701 et seq. (providing that the State manages and regulates unregulated encroachments upon the beds of all navigable waters); (4) LSA-R.S. 38:307 (State's grant of administrative authority to Levee Board to construct levees, seawalls and other works along the shore and in the bed of Lake Pontchartrain at a distance not to exceed 3 miles from the present shoreline and to give the Levee Board title to those areas reclaimed.)
[7] We agree with the court of appeal's conclusion that even though the eastern boundary of the area granted by the State to the City may intersect the Point, the entire Point is under the exclusive control of the City because it was an "existing encroachment" at the time LSA-R.S. 41:1701 was enacted in 1978. That statute gave the State management of all "unregulated encroachments" upon its water bottoms, but specifically provided that the Act did not apply to "existing encroachments." LSA-R.S. 41:1705(4). See Socorro, 561 So.2d at 473-74. Furthermore, we have recently explained in Doughty v. Insured Lloyds Ins. Co., 576 So.2d 461 (La., 1991), that although ownership creates the presumption of garde, that presumption is rebuttable by the owner's proving that he had no actual control over the thing. Therefore, at most, like the wife's community property interest in a movable owned by a business exclusively operated by her husband, the State's interest in a small part of the Point possibly falling outside of the area where the City was granted exclusive control, was remote.
[8] The court of appeal held the City responsible under both strict liability, LSA-C.C. art. 2317, and negligence, LSA-C.C. art. 2315 and 2316. Because we find the City negligent, we need not address whether the City was responsible under a strict liability theory.
[9] See Dobson v. Louisiana Power & Light Co., 567 So.2d 569, 575 (La.1990) where we used the "Hand formula" to explain that if "the product of the likelihood of injury multiplied times the seriousness of the injury exceeds the burden of the precautions, the risk is unreasonable and the failure to take precautions or sacrifice the interest is negligence." (citing L. Hand, J. in Conway v. O'Brien, 111 F.2d 611, 612 (2d Cir. 1940; other citations omitted)).
[10] Socorro's severed spinal cord left him with only slight function at the C-5 level, and no function below the C-6 level which includes a significant part of his arms, his hands, his legs and bowel function. As a result of plaintiff's quadriplegic condition, his future earning capacity is severely limited, he is burdened with significant past and future medical expenses, and his pain, suffering and loss of enjoyment of life is extreme.
[11] Because we cast only the City in judgment, we do not address the plaintiff's argument that the $500,000 limit applies separately to each governmental defendant.
[12] "A substantive law is one that creates an obligation, while a procedural, remedial or curative statute relates to the form of the proceeding or the operation of the laws." Graham v. Sequoya Corp., 478 So.2d 1223, 1226 (La.1985) (citations omitted).
[13] La.Code Civ.Proc. art. 925 provides that "[w]hen a defendant makes an appearance, all objections which may be raised through the declinatory exception, except the court's lack of jurisdiction over the subject matter of the action, are waived unless pleaded therein." Because Angelina made a general appearance (in which it styled itself "defendant"), it waived the declinatory exceptions of insufficiency of citation and insufficiency of service of process because those exceptions were not pleaded at the same time as the motion for summary judgment. La.Code Civ.Proc. art. 925.
[14] In its joint motion for summary judgment, Angelina acknowledged that it was the City's insurer and did not move for summary judgment on the grounds of a policy exclusion. Rather, the joint motion urged that summary judgment be granted to Angelina and the City on the grounds that the City is entitled to recreational immunity and/or that the City had no legal duty to warn plaintiff of the obvious danger of diving into unknown waters.