DOMENGEAUX, Chief Judge.
On August 27, 1983, Larry Brooks drowned after falling from the boat dock at the Lake Charles Civic Center. Margaret Brooks, the decedent’s surviving spouse and tutrix of the minor, Marquisha Brooks, and Rose Ann Winbush, tutrix of the minor, Brit-taney Winbush, filed wrongful death and survival actions against the City of Lake Charles and its insurer. The plaintiffs’ petition alleged the negligence and strict liability of the City of Lake Charles for the failure to provide guardrails and warning signs at the dock and the failure to restrict the public’s access and use of the dock. After a bifurcated trial, the jury and the. trial judge found no liability on the part of the City. The plaintiffs appeal.

FACTS

The Lake Charles Civic Center abuts the natural body of water known as Lake Charles. A concrete walkway, or promenade area, with metal guardrails extends along the waterfront for the entire length of the complex. The only openings in the guardrails occur at the Civic Center’s three dock facilities: the “Lady Clare” dock, which is not open to the public; the “boat dock,” where this accident occurred; and the “steps dock,” a larger facility to the north of the boat dock.
The boat dock is a concrete platform 9'10" wide and 203'8" long. The boat dock can be reached from the promenade level by descending one of two stairways (approximately five steps) that are located on either end of the platform, or a handicap ramp in the *580 center of the dock. There are guardrails on the two stairways and on the handicap ramp, but there is no railing on the base of the dock at the water’s edge. The original blueprints of the dock and physical evidence at the scene indicate that at one time a guardrail did exist but that this rail extended only five feet from the corner on each end of the dock. This area was built primarily as a boat dock, but the City acknowledged that the public uses the dock for recreational activities such as fishing.
The accident in question occurred at approximately 10:00 p.m. on August 27, 1983. The decedent, Larry Brooks, estranged from his wife at that time, was at the dock area with his girl friend Janice Boyd. Ms. Boyd testified that she and Brooks had spent most of the evening walking along the water at the Civic Center. Later in the evening, they walked down the north stairway of the boat dock and stood in the center of the dock holding hands for about five minutes. When they decided to leave, Ms. Boyd turned toward the south steps, and as she was turning, Brooks fell into the water, pulling her in with him. Michael Francis, who was on the promenade level, ran down to the dock area after he heard the splash. He was able to pull Ms. Boyd out of the water, but he could not reach Brooks. Brooks’ body was found later that evening.
The Civic Center complex was built in 1968. In the mid 1970s, three persons drowned at the facility, but these accidents all occurred at the “steps dock” area. At one time, the steps dock consisted of concrete steps that descended below the water level. The apparent cause of the drownings was the slippery condition created when algae formed on the submerged steps. The City corrected the problem by removing the bottom steps from the water and by constructing a platform similar to the boat dock area. The steps dock platform contains inserts that can be used to construct a temporary “swag” chain fence, but such a barrier was never erected. There have been no drownings at the Civic Center since the problems with the steps dock was corrected.

LIABILITY

The plaintiffs argue that the instant case is governed by Socorro v. City of New Orleans, 579 So.2d 931 (La.1991). In Socorro, the Supreme Court held that the City of New Orleans owed a duty to warn recreational divers of hidden dangers caused by the presence of “rip rap” (pieces of asphalt and concrete shavings which prevented erosion) in the waters of Lake Pontehartrain, notwithstanding the divers’ inherently dangerous conduct of diving into unknown waters and the high social utility of the “rip rap.” The City of Lake Charles, instead, argues that Hall v. Lemieux, 378 So.2d 130 (La.App. 4th Cir.1979), writ denied, 381 So.2d 1220 (La.1980) is controlling, wherein the court stated that there is no duty to provide safeguards against persons falling into water, such as fences or warning signs, in the absence of some hidden or concealed danger.
At the outset, we find the facts of Socorro are clearly distinguishable from the instant ease. Socorro involved the presence of a hidden, dangerous condition set in an area with an illusion of safety. The plaintiffs herein have not alleged nor have they proved that Brooks encountered an unknown or concealed hazard; the presence of the water was obvious to the decedent. However, with the advent of comparative fault, our inquiry cannot stop with the mere statement that the City had no duty to warn of an obvious condition. See Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988); Socorro, p. 941. In Socorro, the Supreme Court stated:
Although we reject the City’s “no duty” argument under these facts, care should be taken to note that we maintain our policy that “the duty which a landowner owes to persons entering his property is governed by a standard of reasonableness, and that a potentially dangerous condition that should be obvious to all comers is not, in all instances, unreasonably dangerous.” Murray, 521 So.2d at 1136 (citing Shelton [v. Aetna Casualty and Surety Co.], 334 So.2d [406] at 410). Therefore, under duty/risk analysis, if the facts of a particular case warrant, there could be a finding that a defendant owed no duty under the circumstances, or on the other hand, that a *581 plaintiff was 100% at fault. Murray, 521 So.2d at 1137 (Cole, J., concurring). (Emphasis added.)
579 So.2d at 941-2.
Turning to the particularities of the instant case, we note that Ms. Boyd testified that the boat dock’s surface was not slippery, nor did she see anything that would have caused Brooks to fall. Additionally, there is no evidence that the lighting at the scene was inadequate. The plaintiffs contend that the boat dock was unreasonably dangerous because of the absence of lifesaving devices, guardrails, and warning signs, combined with the City’s invitation to the public to use the area for other recreational activities.
The plaintiffs supported their position with the testimony of safety expert Michael Fren-zel. Frenzel identified several conditions at the boat dock which he considered unsafe and which could have been remedied at a minimal cost. He believed that a removable, “swag” style barrier (similar to the one contemplated at the steps dock) placed a few feet from the water’s edge would have served as a safety measure without interfering with the docking of boats. He recommended the placement of signs warning the public that the water was deep, that drowning was a hazard, and that no lifeguard was on duty. He also saw the need for lifesaving devices, such as a flotation ring or a long pole with a hook. In response to the City’s claim that vandalism and theft made the placement of such devices at the dock impractical, Frenzel recommended storing them in an “alarmed” glass enclosure that would also alert authorities of an emergency situation.
The City did not introduce its own safety expert, relying instead upon its traversal of Frenzel’s qualifications and cross-examination. Frenzel admitted that he never attended a seminar on dock safety and that he never designed or participated in the construction of a boat dock. On cross-examination, he stated that the boat dock area was too small to be governed by Coast Guard or OSHA regulations, nor could he identify any other regulations that were violated. Regarding the recommended “swag” barrier, he admitted that such a device could easily be disregarded as people walked over or under it. Finally, Mr. Frenzel could identify only larger, commercial, privately owned facilities (such as the River Walk in New Orleans) which installed “alarmed” safety devices.
Considering the above we find no error in the trial court’s conclusion that City employees were not negligent in the design or upkeep of the dock and that the dock did not present an unreasonable risk of harm. Warning signs as to the depth of the water or the absence of a lifeguard would not have prevented this tragedy because the decedent did not go to the dock area to swim. Any barricade or railing along the water’s edge would be inconsistent with the facility’s intended purpose as a boat dock. A “swag” temporary barricade placed a few feet from the water’s edge, as suggested by Mr. Fren-zel, would only have increased the risk of harm by creating a tripping hazard.
We can find no jurisprudence requiring guardrails or warning signs on a boat dock in the absence of a concealed hazard. Nor do we believe that activities such as fishing, strolling, or sunbathing are out of place on docks in general and on this particular dock. When we consider the testimony that establishes the absence of a slippery or tripping condition on the dock and the presence of adequate lighting, the most reasonable conclusion is that this accident was caused by the decedent’s inattentiveness. As contemplated by the quoted language from Socorro, the instant ease is one where the victim was 100% at fault.

CHALLENGES FOR CAUSE

The plaintiffs next argue that the trial judge erred in denying their challenges for cause of two venire persons who were eventually seated as jurors.
Mrs. John Doyle worked for the defense counsel’s law firm in the mid 1970s, approximately 19 years before this trial. She did not know defense counsel, and she never employed his firm for legal services after she left its employment. When asked if her past employment involved insurance defense work, Mrs. Doyle replied, “Yes sir. Mostly—all I can remember that long ago was mostly typing all day.”
*582 Mr. Warren Woolfolk lived near defense counsel’s parents for many years and stated that he watched defense counsel grow up in the neighborhood. Mr. Woolfolk maintained a personal and business relationship with defense counsel’s brother, but the only recent contact with defense counsel would have been to wave if he passed on the street.
The trial court has wide discretion in ruling on a challenge for cause, and its ruling will not be disturbed on appeal absent a showing of abuse of discretion. State v. Gintz, 438 So.2d 1230 (La.App. 3d Cir.1983). In denying the challenge for cause of Mrs. Doyle, the trial judge noted the 19 year absence of contact between her and defense counsel’s firm as well as Mrs. Doyle’s statement that she could be impartial. The trial judge was also impressed with Mr. Wool-folk’s “emphatic” statement that he could be an impartial juror. Plaintiffs allege that Mr. Woolfolk was hostile to their cause, but such conduct is not apparent in the record. Plaintiffs also complain that defense counsel’s brother, with whom Mr. Woolfolk had a personal relationship, appeared in the audience at trial one day. However, plaintiffs’ counsel asked the trial judge to have the brother removed and the court granted the request. We find no abuse of discretion in the trial court’s refusal to permit these jurors to be challenged for cause.

VENIRE COMPOSITION

The plaintiffs next argue that the trial judge erred in denying their motion to increase the jury venire. Of the 150 summonses issued, only 50 persons were available for jury duty. Of those 50, six were immediately excused for various reasons, leaving a venire panel of only 44 persons. Six of the 44 prospective jurors (or 13.6%) were black. Plaintiffs contend that an undersized jury pool combined with the defense’s peremptory challenges of three black venire persons (discussed below) prevented the plaintiffs from having a venire that was a representative cross section of Calcasieu Parish.
Mr. James Andrus, Calcasieu Parish Clerk of Court, testified that potential names for the venire were randomly selected from a computerized list that was purchased in 1988 and updated in 1990. The list was composed of names from the driver’s license bureau and the registrar of voters. The computerized list did not contain any information about the race of the prospective jurors. Mr. Andrus attributed the low response to the summonses to the parish’s inability to continually update the list. After considering the random selection of names and the lack of any information relative to race in the computer, the trial court found that there was no systematic exclusion of blacks from the Cal-casieu Parish venire. Indeed, the evidence at the hearing supports no other conclusion. As to the instant case, we note that the jury eventually impaneled consisted of nine whites and three blacks, for minority representation of 25%. Statistics introduced at the hearing established that the population of Calcasieu Parish was 22.9% black. We can find no evidence that the plaintiffs suffered any prejudice from the venire present at trial. The trial judge did not err in denying the plaintiffs’ motion to increase the venire.

PEREMPTORY CHALLENGES

In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that the Constitution prohibits the exercise of peremptory challenges based solely on race in criminal eases. This rule was extended to civil cases in Edmonson v. Leesville Concrete Co., Inc., — U.S. -, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991).
In Polk v. Dixie Ins. Co., 972 F.2d 83 (5th Cir.1992), cert. denied, — U.S. -, 113 S.Ct. 982, 122 L.Ed.2d 135 (1993), the United States Fifth Circuit summarized the procedure for making a Batson claim at trial:
At trial, proof of a Batson claim is a three-step process. First, the complaining party must make a prima facie showing that opposing counsel exercised a peremptory challenge on the basis of race. If that party is successful, the burden shifts to the striking party to articulate a race-neutral explanation for the strike. If the striking party articulates such a reason, the complaining party must show that the reason proffered is pretextual or otherwise inadequate; and the trial court then must deter *583 mine whether the complaining party has shown the articulated rationale to be pre-textual or has otherwise carried the ultimate burden of proving purposeful discrimination.
The first black venire person to be peremptory challenged was Mr. Frank Meadows. Upon plaintiffs’ objection, the trial judge noted that no pattern of discrimination had been established. Nonetheless, the trial court permitted defense counsel to state on the record a reason for the challenge. Defense counsel then expressed his concern that Mr. Meadows would not be able to separate his previous safety training from the facts of this case. On voir dire, Mr. Meadows stated that he had experience as a lifeguard in the Air Force and had been a safety supervisor for 14 years.
The next black venire person to be challenged was Mr. Arthur Fontenot. At this point, the trial court recognized that a pattern may be developing, and upon plaintiffs’ objection, he ordered defense counsel to offer a racially neutral explanation. Defense counsel referred to several statements by Mr. Fontenot on voir dire which exhibited open sympathy to the plaintiffs. Mr. Fontenot noted that he has two young girls, as did the decedent. At one point, he stated, “I feel sorry for the family, myself.” When asked if he would have any trouble being impartial, Mr. Fontenot replied, “I hope not, Judge.” Although Mr. Fontenot eventually said he could be impartial, the trial judge stated his response was not “convincing.” The trial judge upheld the reason offered by defense counsel as valid.
Mr. James Pierce, Jr. was defense counsel’s third and final peremptory challenge of a black venire person. The reason proffered for the challenge was that, like the decedent, Mr. Pierce was a young, unemployed male. Defense counsel also responded that he was not satisfied with some of the answers given by Mr. Pierce on voir dire. The trial judge also accepted defense counsel’s reasons for challenging Mr. Pierce.
In Polk, supra, the Fifth Circuit recognized that unverifiable, subjective considerations may be sufficient to satisfy the striking party’s burden of articulating a neutral explanation. In the instant case, all explanations offered by the defense counsel are verifiable in the record, nor are they based on unreasonable assumptions. The explanations were acceptable to the trial judge, who was in the best position to determine the credibility evaluations inherent in such situations. We decline to disturb the trial court’s finding of no discrimination.
For the first time in their reply brief, and without assigning it as error, the plaintiffs argue that improper procedure used by the trial court during voir dire prevented them from exercising two of their peremptory challenges. It is difficult to identify the improprieties complained of. Plaintiffs’ reply brief on this point is confusing, and the alleged irregularities as described by the plaintiffs are not apparent in the trial transcript. Further, the transcript reveals that the plaintiffs failed to make any objections during voir dire regarding the allotment of peremptory challenges. Therefore, the plaintiffs have waived any right to object now. See La.R.S. 13:3052.
For the above reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to plaintiffs-appellants.
AFFIRMED.