604 So.2d 1046 (1992)
Ella WILLIAMS, Wife of/and John A. Williams
v.
JEFFERSON PARISH HOSPITAL SERVICE DISTRICT # 2 d/b/a East Jefferson General Hospital, Dr. William A. Rolston & Dr. Marian Belleci.
No. 92-CA-224.
Court of Appeal of Louisiana, Fifth Circuit.
July 27, 1992.
Rehearing Denied October 19, 1992.
*1047 Daryl A. Higgins, Leo R. Hemelt, Gretna, for plaintiffs-appellees.
Lucas J. Giordano, Metairie, for defendants-appellants.
Before BOWES, DUFRESNE and WICKER, JJ.
DUFRESNE, Judge.
This is an appeal by East Jefferson General Hospital from an adverse judgment in a medical malpractice action brought by John A. Williams and his wife, Ella. The trial judge fixed total damages to plaintiffs at $583,000, and found the hospital liable for 60% of this amount. For the following reasons, we reduce the amount of damages by $10,000, and further reduce the percentage of fault attributable to the hospital from 60% to 20%. In all other respects, we affirm the judgment.
This case involves two distinct acts of alleged malpractice, (occurring three days apart) on the part of the defendant hospital staff during treatment of Mr. Williams for a heart attack. The first relates to the staff presenting to the emergency room doctor a normal EKG tracing made during a prior admission of plaintiff, rather than the tracing made shortly after his arrival at the emergency room which showed that he was having a heart attack. The second relates to the failure of the staff to record pulse readings in plaintiff's left leg during surgical insertion of an intra-aortic balloon pump (IABP) in preparation for open heart surgery.
A medical review panel concluded that the confusion of the EKG tracings fell below the proper standard of care, but that plaintiff suffered no damages because of this error. However, it further concluded that the failure of the surgical staff to record the pulses during insertion of the IABP was also below the standard of care and that this was a contributing factor in the eventual loss of plaintiff's lower left leg.
Prior to a bench trial of April 29, 1991, the surgeon who installed the device settled the matter for $250,000, and after trial, but before judgment, the emergency room doctor was dismissed on terms not of record.
In his reasons for judgment of December 30, 1991, the trial judge found that the confusion of the EKG tracings had caused plaintiff seventeen hours of needless suffering. He further found that the failure of the staff to record the pulses was a cause of plaintiff losing his leg. He apportioned 10% of fault to the emergency room doctor, 30% to the surgeon, and 60% to the hospital staff. He fixed general damages to plaintiff at $500,000, and special damages for the hospital bill at $58,253.23, and awarded plaintiff's wife $25,000 for loss of consortium. This appeal by the hospital followed.
As to the confusion of the EKG tracings, the following facts are conclusively established by the hospital records and expert medical testimony. On April 27, 1987, at about 4:40 A.M. plaintiff, a 67 year old farmer with a history of heart problems, for which he had previously been treated at East Jefferson General Hospital, was brought to the hospital emergency room by his daughter. His complaints were of chest pains over the last few days which had not responded to his prescribed nitroglycerine medication. The emergency room physician saw him within a few minutes of his arrival and initially thought he was having a heart attack. She immediately *1048 ordered an EKG, blood tests for cardiac enzymes, electrolytes, and glucose, and a blood count, as well as a chest x-ray. While awaiting these tests results, she treated him for pain with a morphine sulfate IV, nitroglycerine under his tongue and a nitro paste chest rub. He was also given oxygen and placed on a heart monitor.
The result of the cardiac enzyme test was negative, but the EKG showed degeneration of his heart condition in comparison with a 1984 EKG, and indicated that he was in fact having a heart attack. However, through apparent inadvertence on the part of the hospital staff, the doctor was handed an unremarkable EKG tracing from his file, instead of the result of the test just performed.
Dr. Montegudo, the doctor on call for Dr. Welch, plaintiff's treating physician, was informed of the negative enzyme test result and the erroneous EKG tracing by the emergency room physician. On the basis of this misinformation, she determined that plaintiff should be discharged and go to Dr. Welch's office later that morning. Plaintiff's daughter objected to the discharge, however, and plaintiff therefore remained in the emergency room until about 9:30 A.M. when Dr. Welch arrived and had him admitted to a regular hospital room. Some twelve hours later Dr. Entes, another associate of Dr. Welch, noted the mistaken EKG, and upon review of the proper tracing of that morning, he had plaintiff moved to the cardiac care unit (CCU).
On this showing, the medical review panel concluded that although the confusion of the EKGs was not a proper standard of care, plaintiff suffered no damage because of this error. All three members of the panel also testified at trial, as did the emergency room doctor, and all four were in agreement that had the proper tracing been read initially, plaintiff's treatment for pain would have been no different than what it actually was. They all further agreed that the failure to place him immediately in the CCU did not cause any physical damage to his heart.
Based on the above evidence, the trial judge found that, except for the administration of oxygen, nothing was done to alleviate plaintiff's pain and discomfort between his arrival at the emergency room and his being placed in the CCU unit seventeen hours later, when his treating physician arrived at the hospital. These findings are manifestly erroneous, and the conclusion that plaintiff was thereby damaged during this initial treatment must therefore be rejected. Rosell v. Esco, 549 So.2d 840 (La.1989).
The trial judge did not apportion general damages between those which he found to have been caused by confusion of the EKGs, and those relating to the loss of the leg. We conclude, however, that a reasonable award for the pain and suffering erroneously determined by the trial judge to have resulted from the EKG problem is $10,000. We therefore reduce the total award by that amount.
As to the second question, the failure of the staff to record pulse readings during insertion of the IABP, or to properly monitor the pulses, the facts are more complex. After several days of hospitalization, it was determined that plaintiff needed open heart surgery and this surgery was scheduled on April 30th. Prior to the main operation, he underwent heart catherization for diagnostic purposes, and during this procedure, the surgeon decided that because of the extensive damage to the heart, insertion of the IABP was necessary to help him survive the actual surgery. The device was therefore inserted into a left leg artery.
This entire procedure was completed at 12:50 P.M., and plaintiff arrived back in the CCU, and was reattached to the monitoring equipment by 1:30 P.M. During the next 15 minutes, the nurse discovered that there was no pulse in the left foot, notified the surgeon, and as per his orders began administering a blood thinner. After about an hour, the thinner had not resulted in restoration of the foot pulse, and at 3:25 P.M., the IABP was removed. The eventual result of loss of blood flow to the leg *1049 was that it had to be amputated below the knee.
The medical review panel concluded that the actions of both the staff and the surgeon who inserted the pump fell below the standard of care, and the result was loss of plaintiff's leg as noted above, all three members of the panel testified at trial.
There were two areas of inquiry relating to the negligence of the staff. The first concerned the failure to record pulse readings in the leg immediately before, during, and immediately after insertion of the device. The second involved taking of pulse readings from the time plaintiff left the catherization lab at 12:50 until the lack of a pulse was actually noted at 1:45 P.M. As to the first problem, all three experts were in agreement that proper procedure would have been for the staff to record pulse readings throughout the insertion of the IABP. Their explanation of the importance of the pulses was that the device can cause interruption of the blood flow below the point of its insertion in the artery, as apparently happened in this case. They all stated that because of this potential problem, it was essential for the surgeon to be aware of the pulses at regular intervals, and especially to know whether there was still a blood flow once the procedure was completed. They also testified that if the surgeon had in fact been aware of the pulses at appropriate times throughout the procedure, then the failure of the staff to record these readings, although improper procedurally, would have had no causative effect on the loss of the leg.
The surgeon who did the procedure testified by way of deposition. He stated that he did not know why the pulses had not been recorded and that it was the staff's job to make such notations. He further testified, however, that he remembered the procedure and was fully aware of the pulses during the entire time.
As to the period between completion of the procedure and discovery of the lack of a foot pulse, there was again unanimity of opinion by the experts. They all acknowledged that to move plaintiff from the catherization lab back to the CCU would have required several people to handle all of the equipment associated with the IABP. All further agreed that the 40 minute time lapse between 12:50, when the procedure was completed, to 1:30, when the heart monitors were again set up, was a reasonable time. Finally, they agreed that the discovery of the leg pulse problem, notification of the doctor, and administration of the blood thinner within the next 15 minutes was also proper care.
The trial judge explicitly rejected the deposition testimony of the surgeon as to his knowledge of the pulses, on the grounds that this doctor was attempting to exhonorate the hospital where he worked. He concluded that the hospital staff's failure to record the pulses was below the standard of care and that this caused, at least in part, the loss of plaintiff's leg. Finally, he found the hospital staff's actions to constitute 60% of the fault in causing the injury.
As to the implicit factual finding that the pulses were not properly monitored by the staff and made known to the surgeon during insertion of the IABP, we find no manifest error. However, we do find such error in the apportionment of 60% of the fault to the hospital staff, Socorro v. City of New Orleans, 579 So.2d 931 (La.1991). We so conclude because of the following expert testimony.
As noted above, the medical experts were in agreement that knowledge of the pulses by the surgeon during the entire IABP insertion is crucial because of the possibility of loss of blood flow. The fact-finder concluded implicitly that the pulses were not properly monitored by the staff, that the surgeon proceeded without this knowledge, and he therefore failed to discover timely the loss of pulse and consequent death of the tissue in the leg. He further found that both the staff and the surgeon breached the proper standard of care.
The next question concerns the relative responsibility of the staff and the surgeon for the resulting damage, In Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), the court set forth a *1050 number of factors to be considered when apportioning fault under the comparative fault system. In the present case we deem of particular importance the question of the relative capacities of the actors, whether superior or inferior. That is say, was it the doctor or the staff who bore the greatest responsibility for insuring that the pulses were known throughout the procedure.
The only direct evidence on this point was provided by Dr. Escarfuller, a panel member, who testified as follows:
Q. Now Doctor, it was a unanimous opinion between you and the other two doctors regarding the violation of the standard care and that it was a factor in the resulting damages. Are you able to quantify in terms of percentages, what the responsibility would have been, let's say for the hospital as opposed to [the physician]?
A. In my own personal opinion I think the responsibility falls almost entirely on [the physician] and the reason why I say that, the hospital may have been not in compliance with the standard of care, but thewhat the nurses did had no bearing on the patient's losing the leg.
Q. That wasn't what your opinion was at that point?
A. That's
Q. Why is it different today?
A. We had found that the damage done to the patient, the reason why the patient lost the leg was essentially the insertion of the balloon and the delay on removing the balloon when the complications developed. Now, the responsibility as far as inserting the balloon, in a patient that probably did not meet all the criteria to have the balloon inserted at that time, number one. Number two, for which the procedure for which an informed consent had not been obtained from a patient by the physician; those were the problems that the panel found to be directly responsible for the patient losing the leg. As far as the hospital is concerned, we did find there was a breach in the standard of care, but that breach of the standard of care by the nursing person did not cost the patient to lose the leg.
Q. Not by itself.
A. Not by itself.
The second panel member, Dr. Pappas, was of a slightly different opinion as to causation. He stated that the problem was not so much the insertion of the pump, a decision which he felt must be left to the discretion of the surgeon on the scene, but rather failure to remove the device as soon as it was learned at about 1:45 p.m., that the blood flow had been obstructed. He further stated that once the surgeon had been informed of the problem and prescribed the blood thinner, rather than immediately removing the device, the matter was completely out of the hands of the staff. The third panel member, Dr. Stein, was of the opinion that insertion of the pump was the cause of loss of the leg, but she did not address the issue of relative responsibility between the staff and the surgeon.
In light of the above testimony it is evident to this court that the apportionment of 60% of fault to the hospital staff was clearly wrong. Our analysis of the evidence shows that a proper allocation of fault to the staff is 20% and we so rule.
The next issue before us concerns the damages awarded, which the hospital contends are excessive. Appellate review of damage awards is initially limited to the question of whether the trial court's award is a clear abuse of the trier of fact's much discretion, Reck v. Stevens, 373 So.2d 498 (La.1979). Unless an articulated analysis of the facts discloses such an abuse, an appellate court cannot substitute its opinion as to what it might have considered an appropriate award had it been sitting as the trier of fact, id. In the present case, although we find the awards of $500,000 to plaintiff for loss of his leg, and $25,000 to his wife for loss of consortium, to be on the high side, we are nonetheless unable to articulate any reasons why they are so high as to constitute an abuse of discretion.
As to plaintiff, the evidence shows that although he was 67 years old at the time of the injury, he was nonetheless a very active *1051 and self-reliant man who farmed a number of acres. Because of the injury, he can no longer drive his tractors or automobile, and must be chauffeured about by his children. He has other problems in caring for his daily needs and getting about the house. Further, he testified that prior to the surgery, he had problems with his right leg and depended on the strength of his left leg to keep him mobile. The loss of the left leg has thus had the effect of rendering him almost completely immobile, even with the use of a prosthesis and walker. Considering all of these circumstances we do not find the award so high as to constitute the trier of fact's much discretion.
As to the loss of consortium award, we similarly find no abuse of discretion. The evidence shows that plaintiff requires a special bed and thus no longer sleeps with his wife. He is also unable to help her with daily household chores, and she now has to help him bathe and dress, thus putting additional burdens on her. We therefore affirm that award as well.
We finally note that all parties have stipulated that the posture of this case is such that plaintiff's recovery against the defendant hospital is limited to $100,000, and we so rule.
For the foregoing reasons, the total damage award of $583,253.23, is reduced by $10,000, and the percentage of fault attributable to the hospital is fixed at 20%. Plaintiff's recovery is further limited to $100,000 against the defendant hospital. In all other respects, the judgment is affirmed.
AMENDED, AND AS AMENDED, AFFIRMED.