635 So.2d 760 (1994)
Wayne Lee SANDERS
v.
POSI-SEAL INTERNATIONAL.
No. 93 CA 1007.
Court of Appeal of Louisiana, First Circuit.
April 8, 1994.
*761 Alex W. Wall, Jr., Baton Rouge, for first appellant, Wayne L. Sanders.
Mathile W. Abramson, Baton Rouge, for Ciba-Geigy.
Christopher J. Aubert, Aubert & Burglass, New Orleans, for Posi-Seal.
Troy J. Charpentier, Baton Rouge, for second appellant Control Valve Spec.
John E. McAuliffe, Jr., New Orleans, for intervenor, Sentry Ins.
Before LOTTINGER, C.J., and CRAIN and LeBLANC, JJ.
CRAIN, Judge.
This is an appeal from a summary judgment rendered in favor of defendant-movant Ciba-Geigy Corporation (Ciba-Geigy), in a personal injury and products liability action.
Ciba-Geigy owns and operates a plant in St. Gabriel, Louisiana. A 30 inch butterfly actuator valve (tag # HV0130) is used in the HCN unit of the plant and is instrumental to the operation of the HCN unit. The valve is operated or run by an actuator which is attached to the valve. The actuator and the valve are attached together by a bracket; the actuator is bolted to one side of the bracket by four bolts and the valve is bolted to the opposite side of the bracket by four separate bolts.
Routine inspections and maintenance are performed at the plant and the HCN unit is periodically shut down in order to have the valves serviced. Such servicing or repairing is done by outside labor at an industrial valve repair shop. In December of 1988, Ciba-Geigy sent several valves for reconditioning and repair to Southern Valve Services, Inc. (Southern Valve). Among those sent was the 30 inch butterfly actuator valve (tag # HV0130). The valve had previously been repaired or reconditioned for Ciba-Geigy in 1985 by Control Valve Specialists, Inc. (Control Valve).
Wayne Lee Sanders was employed by Southern Valve as an industrial valve repairer since 1978. He had been previously employed by another business performing the same type of repairs from 1974 to 1978. Mr. Sanders' task was to test the valve, repair it if it did not work properly and recondition it to make it like new.
The first step in repairing or reconditioning the valve is to "stroke" the valve. This is accomplished by applying pneumatic air pressure to the air cylinder of the valve unit in order to test it to observe how it operates on the "line" or HCN unit. In preparing to "stroke" it, Sanders placed the valve unit on top of a five gallon metal bucket instead of fastening it in a vise which was apparently *762 available for such repairs. When Sanders applied the air pressure either the bolts sheared off causing the actuator to break loose and strike Sanders on the leg, or the valve fell off the bucket striking Sanders on the leg.
Sanders instituted this suit against Ciba-Geigy, in negligence and strict liability as the owner and custodian of the actuator valve, alleging Ciba-Geigy improperly bolted and installed the actuator to the valve; failed to warn Southern Valve employees that the actuator had been improperly installed; failed to repair and keep the unit in safe working order; and failed to repair the defective condition. Additional named defendants were Posi-Seal International, Inc. and Bettis, Inc., as the manufacturers of the valve and actuator; Baro Controls of La., Inc., as the installer of the unit; and Control Valve Specialists, previous repairers of the unit.
Ciba-Geigy, Control Valve, and Fisher Controls International, Inc.[1] filed separate motions for summary judgment. The trial court granted Ciba-Geigy's motion for summary judgment and denied the others. Plaintiff subsequently filed a motion for a new trial which was denied by the court. Plaintiff appeals the denial of the motion for new trial and the granting of the summary judgment. Control Valve has also appealed the granting of the summary judgment.
The sole issue before us is whether the trial court was correct in determining that Ciba-Geigy owed no duty to Sanders to prevent the harm suffered by either warning of the danger or by curing the defect.

SUMMARY JUDGMENT
A summary judgment should be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.C.C.P. art. 966. The mover has the burden of establishing that reasonable minds must inevitably conclude that on the facts before the court the mover is entitled to judgment as a matter of law. See Insley v. Titan Insurance Co., 589 So.2d 10 (La.App. 1st Cir.1991). The applicable standard of review is a de novo review, using the same criteria used by the district court in deciding whether summary judgment should be granted. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342 (La.1991).
Liability based on negligence is present when applying a duty-risk analysis: the conduct is a cause in fact of the resultant harm; defendant owed a duty to plaintiff; the duty was breached; and the risk or harm caused was within the scope of the duty. Fox v. Board of Supervisors of Louisiana State University, 576 So.2d 978 (La.1991). In order to recover in strict liability under La.C.C. art. 2317 against the owner of a thing the claimant must prove that he was injured by the thing; the thing was in defendant's custody; there existed in the thing a vice or defect which created an unreasonable risk of harm; and the damage or harm arose from that danger. Upon proof of these elements the custodian is responsible for damages unless he proves the harm was caused by victim fault, third party fault or irresistible force. Ross v. La Coste de Monterville, 502 So.2d 1026 (La.1987). The unreasonable risk of harm criterion is a question of law and the analytical process in its determination is similar to that employed in determining the reasonableness of the risk, scope of duty, or legal cause under the duty/risk analysis in a traditional negligence problem. Entrevia v. Hood, 427 So.2d 1146 (La.1983). The analysis is similar because under both a strict liability and duty/risk analysis: "the judge is called upon to decide questions of social utility that require him to consider the particular case in terms of moral, social and economic considerations, in the same way that the legislator finds the standards or patterns of utility and morals in the life of the community." Id. at 1149-1150.
Although the method for determining liability under articles 2315 and 2317 is different, *763 the duty is the same. The primary difference in liability under the two articles is that under article 2317 the claimant is relieved of proving actual or constructive knowledge of the risk by the owner or custodian. Daigle v. Legendre, 619 So.2d 836 (La.App. 1st Cir.1993), writ. denied, 625 So.2d 1040 (La.1993).
Thus we must determine whether the actuator valve unit created an unreasonable risk of harm or was unreasonably dangerous vis a vis Mr. Sanders and those similarly situated. See Ladue v. Chevron, U.S.A., Inc., 920 F.2d 272 (U.S. 5th Cir.1991). "In considering a defendant's duty to a particular person, consideration should be given to the person's age, maturity, experience, familiarity with the premises and its dangers, and other factors which might increase or decrease the risk of harm to that person." Glankler v. Rapides Parish School Board, 610 So.2d 1020, 1032 (La.App. 3d Cir.1992), writ. denied, 614 So.2d 78 (La.1993). In so doing, we must consider the "moral, social and economic values as well as the ideal of justice in reaching an intelligent and responsible decision...." Entrevia v. Hood, 427 So.2d at 1149. We must additionally study the law and customs, balance the claims and interests, weigh the risk and gravity of harm, and consider the rights and obligations of individuals and society.
In Plaintiff's Exhibit D, which is a portion of the deposition of Raoul W. Robert, President of Southern Valve, Mr. Robert stated that "stroking" the valve is the necessary first step for determining the condition of the valve when it is brought in for repair. Placing the valve unit on a five gallon bucket is not the proper way to position the unit to "stroke" it because "[i]t's probably not secure enough. It could fall off."
In Defense Exhibit C, Mr. Robert stated he probably would have advised Mr. Sanders to mount the valve in a vise for "stroking". Mr. Robert's concern in the placement of the valve for "stroking" was that movement would cause the valve to fall off the bucket on which it rested possibly damaging the valve.
In Plaintiff's Exhibit I, a portion of the transcript of the deposition of Jan Bullock, Mr. Sanders' supervisor, Mr. Bullock stated that if the unit was propped on a five gallon bucket in order to "stroke" it, that was not the proper method to proceed because the valve was too heavy to be placed on a bucket. It would have been better placed on the floor.
In Plaintiff's Exhibit H, and Defense Exhibit B, both of which are copies of the deposition of Mr. Sanders, Sanders stated that bolts should be changed each time a valve is reconditioned.
In Plaintiff's Exhibit D, the deposition of Jan Bullock, Mr. Bullock stated that as a matter of course when repairing or reconditioning valves the used bolts and studs are routinely replaced with new ones because the used bolts are subject to corrosion, stress and wear.
Assuming for purposes of this argument that Ciba-Geigy had control of the valve when plaintiff was injured, the liability of Ciba-Geigy hinges on the duty owed by Ciba-Geigy to this particular plaintiff. Sanders was an experienced repairman who was aware that nuts and bolts attaching the valve and actuator were susceptible to metal fatigue and corrosion and in order to prevent problems such as the shearing of bolts, Sanders was going to replace those bolts per Southern Valve's routine policy. Thus Sanders was aware of the possible danger of metal fatigue or corrosion of the bolts attaching both the valve and actuator, and as an experienced repairman, he should have been aware of the proper method to "stroke" the valve. Plaintiff's employer was hired to recondition and repair the valve unit. The manner which plaintiff chose to test or "stroke" the valve was of plaintiff's choosing. There were safer methods to choose, such as placing the valve unit in a vise.
The law should and does encourage owners to repair. Triplette v. Exxon Corp., U.S.A., 554 So.2d 1361 (La.App. 1st Cir.1989); Stine v. Creel, 417 So.2d 1243 (La.App. 1st Cir.), writ. denied, 422 So.2d 163 (La.1982).
In Ladue v. Chevron, 920 F.2d 272, which involved analysis of strict liability under La. C.C. arts. 2317 and 2322 for the injury of an *764 independent contractor hired to repair an offshore mineral production platform the court stated the economic incentive placed on an owner to repair and maintain his property:
would be destroyed if owners are held strictly liable when repairmen are injured by the very condition they are hired to repair. Repair operations increase the owner's exposure by focusing activity on the defective part of the structure. The owner cannot avoid strict liability by depending on the independent contractor to protect the safety of his employees as he might in a negligence action. Thus, the owner in effect would become an involuntary workers' compensation insurer. This would increase the cost of effecting repairs, deterring owners from maintaining socially and economically valuable structures. Subjecting repairmen to the risks involved in a given operation is a reasonable course of action, for they are presumptively cognizant of those risks and are able to minimize them.
Imposing strict liability on building owners also might have one important secondary effect: it might encourage renovation contractors to cut corners both in safety practices and in insuring against possible injury. Any employee injured on a job under a strict-liability regime would be fully compensated by the building owner at no cost to the contractor. The incentive for the contractor to provide for the safety of his employees and for their well-being in case of injury is thus reduced.
Ladue v. Chevron, 920 F.2d at 278. Although this reasoning pertained to a structure under articles 2322 and 2317 it is applicable to the repair and reconditioning of the industrial valve at issue here.
The actuator valve comprised an integral part of the HCN unit of the Ciba-Geigy plant, and is of social and economic benefit to the community. The community as a whole, as well as the Ciba-Geigy employees in particular, are served by Ciba-Geigy's efforts to maintain its equipment. Thus for the good of the community, Ciba-Giegy should be encouraged to repair or recondition its equipment, because that is the "socially and economically desirable" thing to do. Entrevia, 427 So.2d at 1150. Further, articles 2317 and 2315 place an economic incentive on owners to maintain or repair their property. Id. at 1148.
The jurisprudence has refrained from imposing liability on a plaintiff whose injury results from a condition which should have been observed by that individual or by one exercising reasonable care, or which condition was as obvious to the claimant as it was to the custodian or owner. This is especially true in situations where the claimant was engaged in the business of repairing or eliminating the very condition which gave rise to his injury. See e.g., Annis v. Shapiro, 517 So.2d 1237 (La.App. 4th Cir.1987), (swimming pool cleaner injured when he slipped and fell in grime at bottom of pool which he drained in order to clean); Shaw v. Fidelity & Casualty Insurance Co., 582 So.2d 919 (La.App. 2d Cir.1991) (defective condition of house exterior should have been apparent to house painter who died as result of his ladder's slipping on slippery concrete porch).
Accordingly, we affirm the judgment of the trial court holding that Ciba-Giegy owed no duty to warn this particular plaintiff about the risk, if any, posed by the actuator valve which plaintiff, through his employer, was hired to repair.[2] The valve unit created no unreasonable risk of harm to this plaintiff, *765 nor was the harm or risk within the scope of protection afforded by the duty. To hold otherwise would penalize persons who seek to keep their property repaired partly in order to avoid the very liability imposed by La.C.C. arts. 2315 and 2317. Cost of this appeal is assessed against appellants.
AFFIRMED.
NOTES
[1] Fischer Controls, Inc. was substituted for defendant Posi-Seal International, Inc. by order of the court dated August 19, 1992.
[2] In this case the thing to be repaired was taken physically to the repairer. Consequently, it might also be analyzed under the law governing a deposit. When Ciba-Giegy sent the valve to Southern for repair this constituted a deposit with Southern being the depositary and Ciba-Geigy the depositor. La.C.C. arts. 2926-2963; Hanchey v. State Farm Mutual Automobile Ins. Co., 570 So.2d 2 (La.App. 3d Cir.1990), writ denied, 572 So.2d 95 (La.1991). When a depositary makes a claim for damages allegedly caused by the deposited property, the depositor is not liable unless he knew or should have known of the dangerous nature, if any, of the deposited property and failed to warn the depositary. La. C.C. art. 2960; Hanchey v. State Farm, 570 So.2d at 5 (automobile left at auto garage for repair. Garage owner drives car to return it to owner and is injured when defect in acceleration system of vehicle caused it to accelerate, causing crash). The same result is reached analyzing the case under La.C.C. arts. 2315 and 2317, or under La.C.C. arts. 2926-2963.