692 So.2d 1127 (1997)
Norman DEUMITE, Individually and as Provisional Curator for his Son, Sloan Deumite; Sloan Deumite; and Kay Deumite
v.
STATE of Louisiana, State of Louisiana, Department of Wildlife and Fisheries; State of Louisiana, Department of Transportation and Development; State of Louisiana, Department of Public Safety; Pointe Coupee Parish Police Jury; Hillary J. Langlois, Jr., Mickey Ewing Langlois d/b/a Jerry's Boat Landing; Jerry's Boat Landing; ABC Insurance Company; DEF Insurance Company, JKL Insurance Company; MNO Insurance Company; PQR Insurance Company; and XYZ Insurance Company.
No. 94 CA 1210R.
Court of Appeal of Louisiana, First Circuit.
February 14, 1997.
Dissenting Opinion April 23, 1997.
Rehearing Denied April 24, 1997.
*1129 Rick A. Caballero, Donald W. Price, Baton Rouge, and Patrick W. Pendley, Plaquemine, for Plaintiffs-Appellees Norman Deumite, et al.
Richard P. Ieyoub, Attorney General, Terri M. Collins, Spec. Asst. Atty. General, Baton Rouge, for Defendants-Appellants State of Louisiana, State of Louisiana Department of Wildlife and Fisheries and State of Louisiana Department of Natural Resources.
Before LOTTINGER, WATKINS, PITCHER, KUHN and TANNER,[1] JJ.
Dissenting Opinion of Judge Kuhn, April 23, 1997.
WATKINS, Judge.
Seventeen-year-old Sloan Deumite was severely injured in a diving accident on False River Lake on August 30, 1986. He and his parents sued the State of Louisiana and various state departments. The trial court rendered judgment in plaintiffs' favor and against the State. At the trial level, the Department of Wildlife and Fisheries (DWF) urged the defense of immunity under Subsection E of the Recreational Use Statute, LSA-R.S. 9:2795, and the trial court declared that statutory provision unconstitutional; because of this declaration, this court originally transferred this appeal to the Louisiana Supreme Court.
The Louisiana Supreme Court rendered an opinion holding the trial court's declaration of unconstitutionality was error because it was not essential to the decision of the instant case. Deumite v. State of Louisiana, 95-1263, (2/28/96); 668 So.2d 727. The court noted that the record shows False River Lake is used for recreational purposes and Mr. Deumite's accident occurred while he was using the lake for recreational purposes, specifically water skiing, swimming, and diving. Thus, the DWF was able to satisfy the same recreational use standards imposed upon private landowners without having to rely on the relaxed immunity standard of Subsection E of the statute. Compare Price v. Exxon Corp., 95-0392 (La.App. 1st Cir. 11/9/95), 664 So.2d 1273, in which this court rejected the constitutional attack on LSA-R.S. 9:2795 E, finding no constitutional impediment to the application of statutory immunity under the facts of the case where the DWF enjoyed the same status as any other private owner who has made his property available for recreational use.
*1130 Accordingly, the Louisiana Supreme Court vacated the trial court's declaration of unconstitutionality and remanded the case to this court "for consideration of all remaining issues, including whether False River and its water bottoms meet the Keelen [v. Louisiana Department of Culture, Recreation and Tourism, 463 So.2d 1287 (La.1985)] test."

FACTS
On August 30, 1986, Mr. Deumite took his boat out on False River Lake so he and some friends could go water skiing. The trial court found Mr. Deumite was "somewhat familiar" with the lake. After he launched the boat at Bonadventure's Landing on the New Roads side of the lake, he discovered the plug had not been inserted. He entered the water near the dock at Bonadventure's, jumping in feet first from the boat; the water was over his head at that location.
After Mr. Deumite replaced the plug, he and the young men with him in the boat proceeded out onto the lake. They were soon joined by Erica Day and Michelin Medine, two girls they knew. The group decided to buy some soft drinks and snacks, so they took the boat to Jerry's Boat Landing, on the island side of the lake, on the shore opposite the New Roads side where Bonadventure's was located. Todd Bergeron and Brett Merritt left the boat to make the purchases, while the others waited in the boat at the dock. Because someone else needed to reach the fuel pump, Mr. Deumite allowed his boat to drift away from the dock.
When Mr. Deumite's boat was approximately 50 feet from the dock at Jerry's, about 100 feet from the shore, Mr. Deumite dove into the water. The trial court found that he performed a shallow dive. However, Mr. Deumite did not surface, and his companions became worried about him and called out for help. About that time a group of university students backed their boat away from the dock. Randy Trellis and Richard Overton dove into the water to look for the missing diver. Mr. Overton, who had had swimming and lifeguard training, made a shallow dive; he testified the water in this area was about three feet deep, and he scraped his chest on the bottom despite his shallow dive.
Eventually, the two young men found Mr. Deumite and pulled him out of the water. They performed CPR until paramedics arrived to take him to the hospital in Baton Rouge, Louisiana. Although Mr. Deumite survived the accident, he suffered a broken neck, which left him a quadriplegic. Because of the amount of time he was underwater, he was left with anoxic brain damage.
The trial court found for a fact that the water in the area of the accident looked the same as the water across the lake at Bonadventure's Landing. There was no vegetation on the water bottoms in the area, as it had been killed by herbicide spraying by the DWF. The court also found that the elevation of the lake bed in the area of the dive was higher, and the depth of the lake shallower, than it would have been naturally, because a drainage project by the old Department of Public Works in the late 1940s lowered the level of False River Lake by three feet. Further, spoil dumped in the area with the knowledge of the Department of Natural Resources (DNR) and without any attempt by the DNR to regulate or stop the dumping combined with increased drainage from various canals to cause the formation of a delta of silt. The parties do not dispute that the State had knowledge of the three-foot depth at the accident site for years prior to the accident.
The trial court found no fault on the part of the Department of Transportation and Development (DOTD) and its predecessor, the Department of Public Works, or on the part of the Department of Public Safety (DPS), which had no connection with the lake beyond the early 1980s. The court concluded that the DNR's negligence in failing to regulate encroachments, such as the dock at Jerry's Landing, caused Mr. Deumite's injuries. The court explained:
The DNR has the responsibility of regulating state-owned water bottoms, such as that of False River lake [sic], while the DWF is responsible for law enforcement and patrolling. The situation here is similar to that present in Thibodeau v. Mayor and Councilmen of Morgan City, 619 *1131 So.2d 595 (La.App. 1st Cir.1993), where the First Circuit concluded that there was a duty to warn because of prior injuries and the dangerous nature of the lake.... The state created and thus knew of the artificially shallow nature of this area. The removal of the natural warnings from vegetation, the apparent depth of the water, and the presence of the boat launch and its dock made the area deceptive and dangerous, creating an "illusion of safety" similar to that in Socorro v. City of New Orleans, 579 So. 2d 931 (La.1991). Given these facts, the attractive nuisance the area created for children such as Sloan,[2] and the ease with which warning could have avoided injury, the court concludes that in this case, both DWF and DNR had a duty to warn potential users generally, and Sloan Deumite specifically, of the shallowness of the water in this area. [Footnote added.]
The court also found that the State of Louisiana, as owner, and the DNR, as statutory custodian of the lake, had garde of False River Lake and were strictly liable under LSA-C.C. art. 2317. The court specified that the lake and its "altered bottom at the accident site" was unreasonably dangerous.
The court found Mr. Deumite was 50 percent at fault for his own injuries and reduced the awards accordingly. The appellees have neither appealed nor answered the appeal to challenge the percentage of fault attributed to Mr. Deumite or the court's exoneration of the DOTD and the DPS.

KEELEN TEST
At the time of Mr. Deumite's accident, the general recreational immunity provision in LSA-R.S. 9:2795(B) provided:
B. (1) Except for willful or malicious failure to warn against a dangerous condition, use, structure, or activity, an owner of land, except an owner of commercial recreational developments or facilities, who permits with or without charge any person to use his land for recreational purposes as herein defined does not thereby:
(a) Extend any assurance that the premises are safe for any purposes.
(b) Constitute such person the legal status of an invitee or licensee to whom a duty of care is owed.
(c) Incur liability for any injury to person or property incurred by such person.
A specific immunity provision applicable to lands or water bottoms owned or operated by the DWF was enacted and went into effect on August 29, 1986, one day before Mr. Deumite's accident. The amendment is provided in LSA-R.S. 9:2795 E, as follows:
E. The limitation of liability provided in this Section shall apply to any lands or waterbottoms owned, leased, or managed by the Department of Wildlife and Fisheries, regardless of the purposes for which the land or waterbottoms are used, and whether they are used for recreational or nonrecreational purposes.
In its remand of the instant case to this court, the Louisiana Supreme Court stated:
This statute addresses the liability of an owner of property used for any recreational purpose. Keelen v. Louisiana Department of Culture, Recreation and Tourism, 463 So.2d 1287, 1289 (La.1985). Despite the statute's broad language, this Court has placed two limitations upon its applicability. The first limitation, upon the type of land or water bottom covered, was established in Keelen. Therein, it was determined that the characteristics of the lands or water bottoms at issue should be examined, and that only "open and undeveloped expanses of property" are covered. Further, this Court concluded that the injurycausing condition or instrumentality is a factor to be used in determining whether it *1132 is of the type normally encountered in the "true outdoors." Keelen, 463 So.2d at 1290. The second limitation was established in Monteville v. Terrebonne Parish Consolidated Government, 567 So.2d 1097 (La.1990). Therein, this Court found that the recreational immunity statute applies only to the owners of private lands or water bottoms.
Thus, a private owner may be immune from liability under La. R.S. 9:2795(B) for injuries occurring on his property if it is shown that: (1) the land or water bottom is used for "recreational purposes;" and (2) if the land or water bottom possesses the characteristics set forth in Keelen.

Louisiana R.S. 9:2795(E) contains a specific immunity provision applicable to lands or water bottoms owned or operated by the DWF....
The language of this statute clearly gives the DWF the recreational immunity afforded to private landowners by La. R.S. 9:2795(B)....
[Emphasis in original.]
668 So.2d at 729, 730.
A look at the factual situation encountered in Keelen and some of the language employed will be helpful. Keelen involved the drowning death of an eight-year-old child in a swimming pool in Fountainbleu State Park in St. Tammany Parish. The park was owned by the State and maintained and operated by the Office of State Parks, Department of Culture, Recreation and Tourism. The State filed a motion for summary judgment on the grounds of immunity under the Recreational Use Statutes;[3] the trial court granted summary judgment, and this court affirmed, Keelen, 454 So.2d 147 (La.App. 1st Cir.1984). This court noted the fact that Fountainbleu State Park is a "developed recreational facility."
Granting writs, the Louisiana Supreme Court stated the two issues before it were whether the Recreational Use Statutes applied to the State and its political subdivisions and whether the statutes conferred immunity from liability for a drowning in a swimming pool at the state park. Because the court held LSA-R.S. 9:2795 did not confer liability for a drowning in a swimming pool, the first issue was not considered by the court.[4]
The Louisiana Supreme Court's analysis was as follows:
The statement of purpose of La. R.S. 9:2795 is contained in 1975 La. Acts, No. 615, § 1 and provides:
The purpose of the act is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes.
The use of the language "land and water areas" is suggestive of open and undeveloped expanses of property. Furthermore, the type of recreational activities enumerated in both statuteshunting, fishing, trapping, camping, nature study, etc.can normally be accommodated only on large tracts or areas of natural and undeveloped lands located in thinly-populated rural or semi-rural locales. Specification of these types of activities suggests a policy that would encourage landowners to keep their property in a natural, open and environmentally wholesome state. We would stray from this goal were we to construe the statutes to grant a blanket immunity to landowners without regard to the characteristics of their property. Thus, we conclude that the legislature intended to confer immunity upon owners of undeveloped, nonresidential rural or semi-rural land areas. The size, naturalness and remoteness or insulation from populated areas all attribute *1133 to the categorization of property as rural or semi-rural.
The existence of some improvements on relatively undeveloped rural or semi-rural property does not change the character of the land so as to deprive its owner of the immunity granted by the statutes. Improvements such as shelters, toilet facilities, fireplaces, etc. are merely conveniences incidental to the use of the land for enumerated recreational activities and do not of themselves take property out of a rural, undeveloped classification. This view is reinforced by the fact that the definitions of "premises" in La. R.S. 9:2791 and of "land" in La. R.S. 9:2795 include "buildings, structures and machinery."
463 So.2d at 1290.
Noting that the question of whether Fountainbleu State Park is non-residential, unimproved rural or semi-rural property would require a review of facts not in the record, the Louisiana Supreme Court rested its decision that the State was not immune from liability for the child's drowning on the fact that the drowning occurred in a swimming pool, not in a lake or pond. The court stated:
Examination of the characteristics of the land alone does not end the inquiry into whether the statutes apply to a particular factual situation. The injury-causing condition or instrumentality must also be scrutinized. Again, reference to the types of recreational activities specified in the statutes (hiking, boating, horseback riding, etc.) indicates that the legislature envisioned immunity for landowners who offer their property for recreation that can be pursued in the "true outdoors." When the injury-causing condition or instrumentality is of the type normally encountered in the true outdoors, then the statutes provide immunity. Conversely, when the instrumentality, whether found in an urban or rural locale, is of the type usually found in someone's backyard, then the statutes afford no protection. [Footnote omitted.]
... [I]t is clear that a swimming pool is not the type of instrumentality commonly found in the true outdoors. Rather, swimming pools are most often found in residential backyards. We recognize that "swimming" is included in the list of recreational activities in La. R.S. 9:2795; however, the word should be construed by reference to the context in which it is found. La. Civ.Code art. 16. Such consideration leads to the conclusion that the legislature intended to grant immunity for injuries incurred while swimming in lakes, rivers, ponds or other similar bodies of water. Thus, an injury which occurs in a swimming pool is not subject to a defense of immunity under La. R.S. 9:2791 and 2795. [Emphasis supplied.]
463 So.2d at 1290, 1291.
Since Keelen, courts have been obligated to make a complete analysis of the property in question before concluding that the Recreational Use Statutes apply. The facts of each case and the inferences to be drawn from them are examined, and each case is decided on its own particular circumstances. The jurisprudence has developed the following three-part test for determining whether the statutory immunity of the Recreational Use Statutes applies in a given situation. First, the property upon which the injury occurs must be an "undeveloped, nonresidential, and rural or semi-rural" locale. Second, the injury itself must be the result of recreation that can be pursued in the "true outdoors." Third, the injury-causing instrumentality must be of the type normally encountered in the true outdoors and not of the type usually found in someone's back yard. Singletary v. Zellerbach, 554 So.2d 846 (La.App. 1st Cir.1989), citing Ratcliff v. Town of Mandeville, 502 So.2d 566 (La.1987), and Keelen.
We note that the trial court in the instant case did not specifically apply the Keelen test, but referred to some of the characteristics inherent in the test in its consideration of the constitutionality of Subsection E of the Recreational Use Statute. The trial court stated that although Subsection E of the Recreational Use Statute may have been enacted to overcome the Louisiana Supreme Court's holding in Monteville,[5]that *1134 the State and governmental subdivisions of the State did not enjoy the statutory immunitySubsection E was "unconstitutional to the extent that it grants increased immunity regardless of the nature of the land or the purpose for which it is used." [Emphasis supplied.] The trial court stated:
The Court finds that False River lake [sic] is not the type of undeveloped wild land contemplated by the recreational immunity statute. The evidence shows False River is one of, if not the, most heavily used and developed lakes in the state. Its proximity to the metropolitan areas of Lafayette and Baton Rouge make it extremely popular for recreation in the summer months. It is ringed with residences, camps and commercial businesses, and as discussed above, it has been artificially changed for both drainage and recreational purposes. The condition that caused Sloan Deumite's injuries, the shallowness of the lake in this area, was not a natural condition but was manmade. This is not the type of condition contemplated by the recreational immunity statute, which is intended to confer immunity for natural conditions found in the wild.
The trial court concluded that because of the conditions of the lake noted by the court, the state-owned land would not be covered by the Recreational Use Statutes were it owned by a private owner. The trial court then declared the Subsection E unconstitutional because it granted immunity to the State "regardless of the purposes for which the land or waterbottoms are used...."
We conclude the trial court committed an error of law in its interpretation of the statute. Contrary to the trial court's statementthat the statute grants immunity regardless of the nature of the landSubsection E does not address the nature of the land, but addresses only the purposes for which it is used. Subsection E relieves the State of proving the injury was the result of recreation that can be pursued in the true outdoors, the second prong of the Keelen test. Subsection E does not purport to relieve the State of proving that the land or water was undeveloped, nonresidential, and rural or semi-rural and that the injury-causing instrumentality was of the type normally encountered in the true outdoors.
Because the trial court's consideration of the characteristics of False River Lake was made in conjunction with its interpretation of Subsection E of the Recreational Use Statute, an interpretation that resulted in the court's error of law, the court's findings concerning those characteristics are not entitled to the deference accorded under the manifest error standard of review. The manifest error rule does not insulate the factfinder's findings when those findings are based on an incorrect analysis of a statute. Mitchell v. A.T. & T., 27,290 (La.App.2d Cir. 8/28/95) 660 So.2d 204, writ denied, 95-2474 (La.12/15/95); 664 So.2d 456, 457. Furthermore, the State does not dispute the trial court's findings that the lake is heavily used and extremely popular for recreation in the summer months, nor that it is ringed with residences, camps, and commercial businesses; the State does not dispute that the lake was shallow in the area of the dive. The absence of such dispute over these factual matters is another reason we do not have to consider whether those findings are manifestly erroneous. The trial court's conclusion that the above facts prevent False River Lake from being the type of "undeveloped wild land" and the type of natural condition "found in the wild" contemplated by the statute are mere dicta because they were made, not for the purpose of determining immunity from liability, but for the purpose of determining the constitutionality of the Recreational Use Statutes. Compare, Price v. Exxon Corp., 95-0392 (La.App. 1st Cir. 11/9/95) 664 So.2d 1273, in which the trial court found the DWF negligent and liable but did not determine whether its failure to warn was willful. In the instant case, as in Price, we shall review the evidence de novo for the limited purpose of determining whether the State is immune from liability under LSA-R.S. 9:2795.
As the Louisiana Supreme Court has noted, in the instant case there is no serious dispute about the issue of recreational use; *1135 thus, we need not include the second part of the test in our analysis to determine if the water bottoms of False River Lake possess the characteristics set forth in Keelen.

Iniury-Causing Instrumentality:
We will turn our attention first to the third prong of the Keelen test to determine if the "injury causing instrumentality" was of the type normally encountered in the "true outdoors." We accept, for the sake of discussion, that Mr. Deumite's injuries were caused by the shallowness of the lake in the area where the dive occurred; that the bottom of the lake had been "artificially changed for both drainage and recreational purposes;" and that the shallowness of the lake was "not a natural condition but was manmade." These characteristics do not make the water bottoms of False River Lake an instrumentality not normally encountered in the true outdoors. False River Lake is a natural body of water, not a swimming pool, as in Keelen. The Keelen court specifically held that the legislature intended to grant immunity for injuries incurred while participating in recreation in lakes, rivers, ponds or other similar bodies of water. The Keelen court did not hold that those lakes, rivers, or ponds had to be completely void of manmade improvements or alterations.[6] The fact that the depth of False River Lake may have been changed by the actions of the State did not change the water bottoms into a "manmade" instrumentality, and even if it did, a manmade instrumentality does not bar a landowner from statutory immunity. See Castille v. Chaisson, 544 So.2d 670 (La.App. 3d Cir.1989), in which the owner of a deep, manmade pond with straight, slippery sides located in a rural setting was immune from tort liability to the parents of a 17-year-old hunter who fell into the pond and drowned.
As previously mentioned, the pertinent inquiry is not whether the injury-causing instrumentality is man-made or partially created by human action or inaction, but whether the instrumentality is of a "type" normally found in the true outdoors. Thus, the following "instrumentalities" satisfied the third prong of the Keelen test: the water bottoms of a natural 18-square-mile lake at a public park featuring a man-made, fenced-in shell beach with a cement and sandbag ledge and located one-half mile from a city, Stuart v. City of Morgan City, 504 So.2d 934 (La.App. 1st Cir.1987); a simple, concrete boat ramp giving access to a small slip or ditch, which in turn connected to the Intracoastal Canal, and which was located beneath a high-rise, immovable bridge, Broussard v. State, Dept. of Transportation and Development, 539 So.2d 824 (La.App. 3d Cir.1989); wooden boards nailed to the trunk of a tree forming steps leading to a homemade diving platform in the tree and located on the banks of a canal near a dam and water control structure, Adams v. State, 525 So.2d 55 (La. App. 3d Cir.1988); a murky, shallow creek known as "a popular swimming hole" and used by members of the general public, LaCroix v. State, Through Dept. of Transportation, 477 So.2d 1246 (La.App. 3d Cir.), writ denied, 478 So.2d 1237 (La.1985); and a 1200-square-yard, manmade pond surrounded by trees and heavy undergrowth, Castille v. Chaisson, supra.
Instrumentalities that have not satisfied the condition of the third prong of the Keelen test are: a dock at a natural body of water, but one located at and part of a civic center complex within the corporate city limits, Brooks v. City of Lake Charles, 488 So.2d 465 (La.App. 3d Cir.1986); a children's slide in a town park, Wadsworth v. Town of Berwick, 484 So.2d 762 (La.App. 1st Cir.1986); a cluster of pilings located in the center of a canal several feet from a gas pipeline, Buras v. United Gas Pipeline Co., 598 So.2d 397 (La. App. 4th Cir.) writ denied, 605 So.2d 1147 (La.1992), oil well cribbings submerged under the water of a dead-end canal connected to the Intracoastal Canal, Eschete v. Mecom, 509 So.2d 840 (La.App. 1st Cir.), writ denied, 513 So.2d 821 (La.1987).
The water bottoms of False River Lake at 100 feet from the shore are clearly distinguishable from a location within a civic center complex, a town park, and commercial *1136 instrumentalities submerged in the water. Thus, we conclude the water bottoms of False River Lake are an instrumentality normally found in the true outdoors and satisfy the third prong of the Keelen test.
Open and Undeveloped Expanse of Property:
Our next consideration, the first prong of the Keelen test, is more difficult. The first prong of the test has been referred to consistently as a determination of whether the site of the injury is an "undeveloped, nonresidential, and rural or semi-rural" locale.
The parties do not dispute the fact that False River Lake is a 3212-acre body of water that was formed hundreds of years ago when the Mississippi River changed courses. The new course of the Mississippi and the "false" river completely surrounded the acreage between them, forming what is now called the "island." The area's proximity to the city of Baton Rouge attracts city dwellers who, seeking escape from the metropolitan area, avail themselves of the marine activities of the lake. The fact that the lake is enjoyed by large numbers of recreational users on a daily basis has led to development along its shores. The State admits the lake is ringed with camps, residences, and commercial establishments, such as docks and boat landings. Although the city of New Roads is located on one shore of False River Lake, the opposite shore on the island side is less populated. However, Jerry's Boat Landing, the commercial dock that Mr. Deumite and his friends visited shortly before the accident, is one of many such facilities built on the island side for the convenience of the people who frequented the lake and its shores in search of the recreational activities available there.
Considering the undisputed evidence concerning the "development" of False River Lake, we conclude the development, at least on the island side of the lake, does not change the character of the area from semi-rural so as to bar the immunity granted by the statutes. It would be incongruous for us to interpret the statutes to exclude this area when the development occurred because of the very activity the statutes were designed to encourage. We think our conclusion is consistent with the jurisprudence as well as being within the intent of the legislature in fashioning the Recreational Use Statutes.
Locations that have satisfied the first prong on the Keelen test are: an 18-square-mile lake within a half mile of a city, but with improvements that were conveniences incidental to the use of the lake for recreational activities and which did not take the property out of a rural, undeveloped classification, Van Pelt v. Morgan City Power Boat Ass'n., Inc., supra, and Stuart v. City of Morgan City, supra; a recreational area accessed by a blacktop road from the highway to a parking lot and boat launch, near a dam and water control structure and a diversion canal, and a small residential community, Adams v. State, supra; a 200-acre tract of pasture land with a few trees, but with residences along a road adjacent to one side, Matherne v. Cheramie, 94-0760 (La.App. 1st Cir. 9/26/95); 664 So.2d 130, writ denied 95-2596 (La.1/5/96); 666 So.2d 311.
Locations that have not satisfied the first prong on the Keelen test are: a fully developed 5.21 acre boat launching and vehicle/trailer parking facility containing a fisherman's landing store, a cement ramp and clam shell driveways and parking areas, located strategically between a state highway and a navigable bayou, Monteville v. Terrebonne Parish Consolidated Government, 567 So.2d 1097 (La.1990); a recreational area within a populated city, adjacent to a much-travelled roadway and "within a stone's throw" of a residential area of a city or town, Landry v. Board of Levee Commissioners of Orleans Levee District, 477 So.2d 672 (La.1985) and Ratcliff v. Town of Mandeville, 502 So.2d 566 (La.1987); a playground within the city limits of Kenner, Louisiana, Herbert v. City of Kenner, 501 So.2d 901 (La.App. 5th Cir.1987).
Accordingly, we conclude the characteristics of the area around False River Lake satisfy the first prong of the Keelen test.
Even though the development around the lake makes our decision that the area remains semi-rural a closer call than if there were no development at all, there is another reason for deciding False River Lake meets *1137 the first prong of the Keelen test. The State contends our classification of False River Lake should be made on the basis of the characteristics of the lake itself, not the surrounding area. We consider this contention persuasive.
The determination of whether False River Lake satisfies the first prong of the Keelen test is made more difficult because the Keelen court was not considering a large body of water, such as a lake. Instead, the question in Keelen was whether Fountainbleu State Park was undeveloped and rural, a question that was not reached by the Louisiana Supreme Court. We note that the terms "undeveloped," "nonresidential," and "rural or semi-rural" cannot be applied readily to a large body of water, such as a lake. Apparently, the Louisiana Supreme Court appreciated this difference and in its remand to this court re-worded the test to be whether the lake and its water bottoms at issue in this case are "open and undeveloped expanses of property."
There is no doubt that the Recreational Use Statutes apply to large expanses of water. Although the general immunity portion of the statute uses the word "land," that term is defined as "land, roads, water, watercourses, private ways and buildings, structures, and machinery or equipment when attached to the realty." LSA-R.S. 9:2795 A(1). Furthermore, Subsection E specifically refers to "waterbottoms."
Since its decision in Keelen, the Louisiana Supreme Court has applied its own criteria only three times in: Landry v. Board of Levee Commissioners, 477 So.2d 672 (La. 1985); Ratcliff v. Town of Mandeville, 502 So.2d 566 (La.1987), and Monteville v. Terrebonne Parish Consolidated Government, 567 So.2d 1097 (La.1990). None of the three cases involved an injury that occurred in a lake.
Both Landry and Ratcliff presented injuries sustained on the shores of Lake Pontchartrain. In Landry, the plaintiff was injured because of a hole in the ground adjacent to the seawall on the New Orleans lakefront. The plaintiff had gone crabbing in the lake between West End and Canal Boulevard in New Orleans, Louisiana. He ascended the seawall to return to his car. As he reached the top of the seawall, he noticed a large hole adjacent to the seawall in the grassy area, which was partially obscured by weeds. In an attempt to avoid the hole, he lost his balance and fell, injuring his knee. The area where plaintiff was injured lay between the seawall and Lakeshore Drive. South of Lakeshore Drive, just preceding the levee, is a grassy area used largely for recreation.. Behind the levee is a residential area. The Louisiana Supreme Court noted that the Keelen court pretermitted the question of whether the park was non-residential, unimproved rural or semi-rural lands. In Landry, the court emphasized that unless the "premises" on which a plaintiff's activities occur are within the purview of the statutes, the activities of the victim and the condition or instrumentality causing the injury are irrelevant. The court held that immunity did not extend to the owner of the property involved, which property was "a recreational area within a populated city, adjacent to a much traveled Lakeshore Drive, and within a stone's throw of an exclusive residential area developed in the City of New Orleans many years ago." Landry, 477 So.2d at 675.
The situation in Ratcliff was almost identical to the situation in Landry, but on the opposite shore of Lake Pontchartrain. In Ratcliff the plaintiff slipped and injured himself while walking on a boat dock after returning from an all night recreational shrimping outing. The dock was owned by and located within the Town of Mandeville. The court noted the dock was also "located in a recreational area within a populated city, adjacent to a frequently travelled Lakeshore Drive and within a stone's throw of a residential area." Ratcliff, 502 So.2d at 567.
Although both of the above cases involved injuries incurred near the lake, the "premises" characterized by the court were not Lake Pontchartrain itself. Thus, we find both Landry and Ratcliff distinguishable from the instant case.
The third case in which the Louisiana Supreme Court applied the Keelen criteria was Monteville. However, the analysis engaged in by Justice Dennis as organ for the majority *1138 was a secondary basis for decision, the central holding of the case being that the immunity of the statutes did not extend to the State and its subdivisions as it did to private landowners, regardless of the nature of the premises. Justice Lemmon and Justice Marcus concurred in Monteville, agreeing that the premises did not qualify under the Keelen criteria. In Monteville the accident occurred on 5.21 acres of land leased by the parish government for use as a public boat launch. The land was located between a state highway and Bayou Petit Cailliou, 22 miles from the City of Houma, Louisiana. The premises included a fisherman's landing store, a cement ramp, and clam shell driveways and parking areas, all surrounded by several camps. On the day of the accident, the plaintiff launched his boat from a trailer at the boat launching facility. As he was pulling the trailer out of the water, one wheel of the trailer became caught in an underwater hole. The plaintiff tried to pull the trailer out of the hole by rapidly accelerating the truck, but the maneuver caused a sudden jerk of the vehicle, which caused the plaintiff personal injury to his back and property damage to his trailer. Again, in Monteville as in the previous cases, the Louisiana Supreme Court was not considering an injury incurred out on an open lake. False River Lake, with its 3212 acres of surface, is more than 600 times the size of the 5.21 acre tract of land in Monteville, making the two "premises" easily distinguishable.
Thus, there are no cases in which the Louisiana Supreme Court directly addressed the issue we address here: whether a large, natural body of water qualifies as an "open and undeveloped expanse of property."[7] The fact that the State may have "artificially" altered its depth, as the trial court found, and controlled vegetation by spraying does not make the lake "developed" property. Considering all of the characteristics of False River Lake, we conclude the lake is an "open and undeveloped expanse of property."
Accordingly, we conclude the State is entitled to the immunity granted in LSA-R.S.9:2795. Having qualified for immunity, the State, according to the provisions of the statute, owed no duty to Mr. Deumite to warn him of the shallow bottom at the accident site or of the removal of the plant life in the area. The statute provides that the landowner does not extend any assurances of safe premises to the recreational user nor constitute such person the legal status of one to whom a duty of care is owed. LSA-R.S. 9:2795 B. Under the statute, the only duty to warn would arise if the State's failure to warn was "willful" or "malicious." The facts of the instant case do not present the issue of such a failure to warn as was encountered by this court in Price v. Exxon Corp., supra.[8] Accord, Stuart v. City of Morgan City, 504 So.2d at 934, in which this court stated, "The essence of La. R.S. 9:2791 and 2795 is that an owner who qualifies for their immunity owes no duty of care and cannot incur liability. No distinction is made in either statute between negligent and strict liability.... The issue is not one of a standard of ... but the existence of a duty owed by the defendants to the appellant." [Emphasis in original.]
Scope of Immunity:
Having decided that the State is entitled to the immunity provided by LSA-R.S. 9:2795 E, we must next determine the scope of that immunity.
We agree with the plaintiffs that absent Subsection E, LSA-R.S. 9:2795 would offer the State no immunity, regardless of the type of premises involved. However, *1139 the plaintiffs continue their argument that the recreational use immunity does not extend to the DNR. They point to the language of Subsection E"limitation of liability provided in this Section shall apply to any lands or waterbottoms owned, leased, or managed by the Department of Wildlife and Fisheries ..."for the proposition that the immunity extends only to the DWF, as that is the only department mentioned in the statute. The plaintiffs cite Bradshaw v. Department of Wildlife & Fisheries, 616 So.2d 799 (La.App. 2d Cir.), writ denied, 620 So.2d 841 (La.1993), as authority for their contention. Although we are not convinced of the soundness of the reasoning in Bradshaw, we disagree with plaintiffs that the case is authority for denying the State immunity in the instant case. Bradshaw is clearly distinguishable.
Before discussing Bradshaw, we must apply the statutory provision within the parameters of the instant case. The language of the statute"limitation of liability shall apply to any lands ..." is ambiguous. Limitation of liability, or immunity, cannot apply to land; it can apply only to a legal entity that can be found liable. Because the statute is ambiguous, we must determine the intent of the legislature. See Scott v. Clark, 583 So.2d 938 (La.App. 1st Cir.1991). To determine that intent, we must look to the immunity provisions as they existed prior to the enactment of the statute. Prior to 1990, in cases brought against public landowners, the issue considered by the Louisiana Supreme Court and this court was whether the immunity granted by the Recreational Use Statutes extended to public landowners as well as private landowners. See Keelen and Stuart. The jurisprudential rule was that public landowners were not excluded; if a landowner qualified for immunity, it was immaterial whether the landowner was a public entity or a private entity. In 1990, the Louisiana Supreme Court decided Monteville, which stated a new interpretation of the Recreational Use Statutes. The court held the Recreational Use Statutes may not be applied to immunize the State, its agencies, or its political subdivisions from tort liability. Although Monteville was decided in 1990, the holding was forecast by Justice Dennis's concurring opinion in Keelen in 1985, and by the issue being raised in the appellate courts. See Van Pelt v. Morgan City Power Boat Association, Inc., supra, and Pratt v. State, 408 So.2d 336 (La.App. 3d Cir.1981), writ denied, 412 So.2d 1098 (La.1982), in which both circuit courts extended the immunity to public landowners. Apparently to resolve the question of whether the Recreational Use Statutes were intended to apply to the State, the legislature enacted Subsection E in 1986. We can attach no significance to the court's failure to mention Subsection E in Monteville, because that case involved an injury incurred in 1985, a year before Subsection E went into effect.[9]
Because the accident in the instant case occurred after the effective date of Subsection E, this court must now consider for the first time the scope of the immunity granted by Subsection E.[10] As previously noted, the immunity of the Recreational Use Statutes extends to landowners, not to the land itself. See Monteville, concurring opinions at 1106. In enacting Subsection E, the legislature intended to identify the State as owner of specific lands, not as a landowner generally. The legislature chose to grant immunity to the State as owner of lands that the DWF owns, leases, or manages.
The control and supervision of the wildlife of this state is vested in the Louisiana Wildlife and Fisheries Commission. LSA-R.S. 36:601. The DWF was created to control and supervise all wildlife of this state, including fish and all other aquatic life, and to execute the law as enacted for the control and supervision of programs relating to the management, protection, conservation, and *1140 replenishment of wildlife, fish, and aquatic life in this state. LSA-R.S.36:602 B. The DWF is responsible for management of all renewable resources on "all wildlife management areas, wildlife refuges, scenic rivers, and wildlife preserves that it may own or lease." Id. For a list of the agencies and game and fish commissions that have been placed within the DWF, see LSA-R.S. 36:610. The DWF is an alter ego of the state; it is concerned with statewide, as opposed to local, problems. Considering that the state statutes and case law view the agencies as arms of the state, any judgment against the DWF would be paid from state funds, and under the Eleventh Amendment, it cannot be sued in federal court. Voisin's Oyster House, Inc. v. Guidry, 799 F.2d 183 (5th Cir.1986).
As far as status is concerned, the DNR is also the alter ego of the state. The DNR is responsible for the conservation, management, and development of water, minerals, and other such natural resources of the state, including coastal restoration and management, except timber and fish and wildlife and their habitats. LSA-R.S. 36:351.[11]
The DWF and the DNR are coterminous departments within the executive branch of government; they are state agencies as contrasted with political subdivisions of the State. In another context, this court has explained that state agencies and political subdivisions are separate and distinct types of governmental entities. See Scott v. Clark, supra. In that case, this court had to determine whether the suit against the defendant Clark could be tried by jury. Clark was an employee of a state agency,[12] the DOTD. The applicable statute in Scott prohibited jury trial against an officer or employee of a political subdivision. The definitions involved in Clark specified that a state agency did not include any political subdivision or any agency of a political subdivision, and that a political subdivision included parishes, municipalities, districts, and other public or governmental bodies of any kind that were not state agencies. Id. at 944.
In Bradshaw, the court did not make the distinction between a state agency, such as the DWF, and a political subdivision, such as the watershed district involved in that case. The plaintiff in Bradshaw was a widow who brought a wrongful death action against the Department of Wildlife and Fisheries and the Bayou D'Arbonne Lake Watershed District. The Second Circuit Court of Appeal held Subsection E extended immunity to the DWF but not to the watershed district. The Bayou D'Arbonne Lake Watershed District is a political subdivision of the State of Louisiana, created for the purpose of conserving the soil and water and developing the natural resources and wealth of the district for sanitary, agricultural or recreational purposes. LSA-R.S.38:2552. It has all the powers of a political subdivision, including but not limited to the power to incur debt and issue bonds therefor. LSA-R.S. 38:2553. Because a political subdivision is not a state agency, it can hardly be classified as the alter ego of the State, according to the rational of Guidry, supra. Thus, we are not presented with the same issue as the Bradshaw court.
In this case, we must decide whether the State can be immune from liability for damages incurred because of the action or inaction of one of its executive department agencies and, at the same time, be not immune from liability for the same damages because the action or inaction of another executive department agency was also involved. To paraphrase an old saying, the State cannot be a little bit immune. This court rejected a similar argument in Keelen v. State, 454 So.2d 147 (La.App. 1st Cir.1984), reversed on other grounds, 463 So.2d 1287 (La.1985). Therein, the plaintiff maintained that if the lifeguards at Fountainbleu State Park were found negligent, the State would be vicariously liable for their negligence and would lose its immunity under the statute. This court stated there was no legal basis for that argument as there was nothing in the Recreational Use Statutes to preclude the immunity *1141 granted the State. Keelen, 454 So.2d at 150.
Accordingly, we hold that the State, as owner of the lake managed by the DWF, does not lose the immunity extended to it by Subsection E of LSA-R.S. 9:2795 because the trial court found both the DWF and the DNR at fault. The issue of whether political subdivisions of the state are immune is not before us. Thus, our holding today does not conflict with Bradshaw.

UNREASONABLY DANGEROUS
Even if the State were not immune, our examination of the record herein convinces us the plaintiffs have failed to prove an essential element of their cause of action against the State: the plaintiffs failed to prove the depth of the water and the water bottom at the site of the accident were unreasonably dangerous.
We look to Socorro v. City of New Orleans, 579 So.2d 931 (La.1991) as the definitive guide to our analysis in a diving case such as the instant one. Therein, the Louisiana Supreme Court cautioned against phrasing the question as whether all riparian landowners are responsible to all plaintiffs injured in diving accidents under all circumstances, or the opposite extreme of whether a landowner never has a duty to warn of the obvious danger of diving into unknown waters. Instead, the proper inquiry in the instant case, according to Socorro, is whether the State is responsible to Mr. Deumite under the facts of this case. The particular facts and circumstances of each individual case determine the extent of the duty and the resulting degree of care necessary to fulfill the duty.
In the instant case, our inquiry begins and ends with the question: What, if any, duty was owed by the State to Mr. Deumite? The plaintiffs argue the State had a duty to warn of the "artificially shallow" water bottom at the accident site because the water there looked the same as the deeper water across the lake. We disagree.
There is no duty to warn of a hazardous condition unless the condition is unreasonably dangerous. The fact that a person is injured does not elevate the condition of the accident site to that of an unreasonably dangerous defect. Shipp v. City of Alexandria, 395 So.2d 727 (La.1981). A landowner only owes a plaintiff a duty to discover any unreasonably dangerous condition and to either correct the condition or warn of its existence. Socorro (at 14). This duty is the same regardless of whether fault is asserted under the negligence theory or a strict liability theory. See Zellers v. National American Ins. Co., 514 So.2d 234 (La.App. 5th Cir.1987). Under both theories, the absence of an unreasonably dangerous condition of a thing implies the absence of a duty on the part of the defendant. Scantlin v. State Farm Ins. Co., 94-0798 (La.App. 1st Cir. 3/3/95) 652 So.2d 640. A water depth of three feet in a large body of water such as False River Lake is not unreasonably dangerous to divers because a person who executes a proper dive can do so at that depth without incurring any injury. Even if we accept the trial court's conclusion that Mr. Deumite executed a shallow dive, he failed to execute a proper dive because he broke his neck in three feet of water.
Furthermore, the jurisprudence has refrained from imposing liability on a defendant when the plaintiff's injury results from a premises condition that should have been observed by one exercising reasonable care. Sanders v. Posi-Seal International, 93-1007 (La.App. 1st Cir. 4/8/94) 635 So.2d 760. It was unreasonable for Mr. Deumite to assume anything about the depth of the water. He had the opportunity to check the depth either by using his water ski or by jumping into the water feet first as he had done previously across the lake. The diver is in a better position than anyone to determine the safety of his activities. Socorro, supra.
The facts in the instant case differ greatly from other cases in which riparian landowners had a duty to warn of a condition that was unreasonably dangerous[13] to divers. A depth of three feet is not dangerous per se; *1142 there must be more to create a hazard. In Socorro, the unreasonably dangerous injurycausing object was not the lake bottom, but was the bulkhead at the dive site, the rip rap forming part of the breakwater, and the lack of signs at that specific area when there were warning signs along other areas of the lakefront In Thibodeau v. City of Morgan City, 619 So.2d 595 (La.App. 1st Cir.), writ denied, 629 So.2d 362 (La.1993); writ granted in part on other grounds, 629 So.2d 362 (La. 1993), there were signs that warned that swimming and diving was "at your own risk," thus misleading the diver into thinking the location was deep enough for diving.

CONCLUSION
Having concluded that the State is not responsible for Mr. Deumite's injuries, we reverse the trial court judgment in his favor and cast appellees for costs of this appeal.
JUDGMENT REVERSED.
LOTTINGER, C.J., concurs.
KUHN, J., dissents and will assign reasons.
KUHN, Judge, dissenting.
I respectfully dissent. I believe the majority has overlooked the appropriate standard of review and ignored basic principles of statutory interpretation.
The majority opinion discusses a de novo review of "the evidence." "Evidence" obviously includes testimony and documents which deal with "facts." A thorough review of the evidence in this case establishes that a de novo review is not warranted. Equally troubling is the majority's creation of an immunity from suit which has not been conferred by the legislature.
The majority suggests that factual findings of the trial court were made in conjunction with an improper interpretation of La. R.S. 9:2795(E), and therefore, are not entitled to deference, i.e., that the trial court committed legal error. I disagree. In ruling, the trial judge addressed the constitutionality of the statute in the context of prior jurisprudence and whether the statute applied to the facts of this case; however, this does not change the much deference this court is required to give to his factual findings under our standard of review. By improperly characterizing the trial court's factual findings as "mere dicta," the majority has obviously given no deference whatsoever to those findings.
The Supreme Court has repeatedly held that a court of appeal may not set aside a trial court's findings of fact in the absence of "manifest error" or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact-finder's conclusion was a reasonable one. Stobart v. State, 617 So.2d 880, 882 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact-finder's the reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d at 844.
One example of the majority's blatant disregard of the manifest error rule is the approach it takes regarding the nature of the lake bottom. The majority concludes the water bottoms of False River Lake are an instrumentality normally found in the true outdoors. However, this conclusion is directly contrary to the trial court's factual finding that the shallowness of the lake was not a natural condition but was man-made. Whether we agree with the result or not, the manifest error rule requires that this court accept the factual finding as long as there is some evidence tending to support it. Another example of the majority's disregard of our appellate standard of review is that although the trial court found the False River Lake is the most heavily used and developed lake in the state, it concludes the site of the injury is an undeveloped, non-residential, and rural or semi-rural locale.
The majority indicates we should examine the lake itself and not the surrounding area in determining whether the property is semi-rural. If one considers "the lake itself" without regard to what has been built over the lake, beneath the surface of the water, on its surface (e.g. spraying) and on the shores. This approach totally ignores what should be *1143 the primary focus, i.e., the entire lake, which includes the lake's bottom, surface and shores.
Regarding the scope of immunity, La. R.S. 9:2795(E) is very clear: immunity is expressly conferred upon the Department of Wildlife and Fisheries ("DWF"). NO OTHER STATE AGENCY IS MENTIONED IN THE STATUTE. The rationale used by the majority extends immunity under La. R.S. 9:2795(E) to all state agencies. In order to reach this conclusion, the majority determines the statute is ambiguous and proceeds to examine the intent of the legislature.
La. C.C. art. 9 directs:
When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.
Clearly, under the plain wording, the Department of Natural Resources cannot use La. R.S. 9:2795 to urge immunity.
When a statute grants immunities or advantages to special classes against the general public, claims of the grantee should be strictly construed. Rodriguez v. Louisiana Medical Mutual Insurance Company, 618 So.2d 390 (La.1993); Livingston Downs Racing Ass'n, Inc. v. State of Louisiana Through Edwin W. Edwards, 94-1514 (La. App., 1st Cir. 4/7/95); 653 So.2d 1311. The recreational use statutes are in derogation of common or natural right and, therefore, are to be strictly interpreted, and must not be extended beyond their obvious meaning. Keelen v. State Dep't of Culture and Recreation, 463 So.2d 1287 (La.1985); Charles Tolmas, Inc. v. Police Jury, 231 La. 1, 90 So.2d 65 (1956). The rule that statutes in derogation of natural or common right are to be strictly interpreted is now generally recognized as being a corollary of the rule that statutes in derogation of the common law are to be interpreted strictly. Ketteringham v. Eureka Homestead Society, 140 La. 176, 72 So. 916 (1916). The rule that immunity statutes must be strictly construed is so well settled that it must be presumed that the legislature acted with full knowledge of the strict interpretation of statutes of this nature. Monteville v. Terrebonne Parish Consolidated Gov't, 567 So.2d 1097 (La.1990). Clearly, the majority's broad application of the immunity granted under La. R.S. 9:2795(E) overlooks many well-established principles that prevent expansion of immunity in this case.
Not only has the majority abandoned traditional standards of appellate review, it has effectively created immunity from suit by "judicially" amending a very specific statute that expressly bestows immunity to a particular state agency. By its approach to this case, the majority has steered the opinion toward its ultimate result.
NOTES
[1] Judge Thomas W. Tanner, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] It does not appear that the attractive nuisance doctrine is an issue in this appeal. Suffice it to say that the oblique reference to the doctrine by the trial court was error because the doctrine cannot apply to this 17-year-old man who was driving his own boat. Application of the attractive nuisance doctrine necessarily includes a finding that the injured child was too young to understand and avoid the danger. See Van Pelt v. Morgan City Power Boat Ass'n., Inc., 489 So.2d 1346, n. 5 (La.App. 1st Cir.1986), writ granted, 493 So.2d 627 (La.1986) (dismissed because of compromise), citing Walker v. Union Oil Mill, Inc., 369 So.2d 1043 (La.1979). See also, Adams v. State, 525 So.2d 55 (La.App. 3d Cir.1988).
[3] The lower courts considered the applicability of LSA-R.S. 9:2791 and LSA-R.S. 9:2795, construed together.
[4] Justice Dennis concurred in Keelen, 482 So.2d 618 (La.1986), stating his opinion that the Recreational Use Statutes were not intended to grant the State immunity from liability for injuries occurring on state-owned land used for recreational purposes "regardless of the characteristics of the land upon which the injury occurred." Four years later, Justice Dennis's view prevailed and he authored Monteville, which overruled the numerous cases that had extended immunity to the State and/or its political subdivisions.
[5] This observation by the trial court was error as Subsection E became effective in 1986, but Monteville was not rendered until 1990.
[6] Such a holding would have been inconsistent with the statute's extension of immunity to "buildings, structures, and machinery or equipment when attached to the realty." LSA-R.S. 9:2795 A(1).
[7] Subsequent to Keelen and Landry, this court held, in two separate cases, that the Recreational Use Statutes provided immunity for diving accidents that occurred when the divers dove from the shore of Lake Palourde. Van Pelt, supra, and Stuart, supra. Distinguishing those cases from a shooting incident in Audubon Park in New Orleans, the Fourth Circuit Court of Appeal noted that both Van Pelt and Stuart involved accidents in lakes "which were specifically mentioned in Keelen as areas to which the immunity statute was intended to apply." Sutter v. Audubon Park Commission, 533 So.2d 1226, 1230 (La.App. 4th Cir.1988), writ denied, 538 So.2d 597 (La.1989).
[8] We note that the accident in Price occurred on Wonder Lake. This court's opinion in that case did not even suggest that Wonder Lake would not qualify as an "open and undeveloped expanse of property"; the decision hinged, instead, on the failure to warn issue.
[9] See Stuart v. City of Morgan City, supra, which was an appeal from a summary judgment granted in 1985. Although this court's opinion was rendered after the enactment of Subsection E, the provision was not mentioned by this court in deciding that the immunities of the Recreational Use Statutes extended to public owners.
[10] In Price, the limitation urged by the plaintiffs in the instant case was not urged. Subsection E was applied, but the State was not immune because of the exception for willful failure to warn.
[11] Prior to 1986, LSA-R.S. 38:2553 provided that the DNR was responsible for the administration and supervision of state lands.
[12] For a definition of state agency, see LSA-R.S. 49:951.
[13] We note the issue of whether the underwater hole in Monteville was unreasonably dangerous was not reached, as the case was an appeal of a summary judgment.